JUAN CENTENO, Plaintiff

v.

HONORABLE CYRIL E. KING, GOVERNOR,
GOVERNMENT OF THE VIRGIN ISLANDS,
HONORABLE GORDON A. FINCH,
COMMISSIONER, DEPARTMENT OF PUBLIC WORKS,
Defendants

Civil No. 158-77

Territorial Court of the Virgin Islands

Div. of St. Croix

November 2, 1977

LEROY A. MERCER, ESQ., Christiansted, St. Croix, *for plaintiff*

PETER A. MARTIN, ESQ., Assistant Attorney General (Department of Law), St. Thomas, V.I., *for defendants*

SILVERLIGHT, *Judge*

### MEMORANDUM OPINION AND JUDGMENT

This is an action for recovery of salary and expenses allegedly due plaintiff pursuant to a study-leave contract

which plaintiff claims was wrongfully terminated by defendants.

The narrative following, for the purposes of Rule 52 F.R.C.P., constitutes the Court's findings of fact and conclusions of law.

Plaintiff Juan Centeno was duly appointed to the position of Director of Administration in the Department of Public Works, St. Croix, V.I., with a pay rate of $16,000.00 per annum, later increased to $19,596.00 per annum. In early November, 1974, Centeno requested that he be granted a one-year study leave as authorized under 3 V.I.C. 677, infra. Both the Commissioner of Public Works, John Harding, and Governor Melvin Evans (both of whom held office at the pertinent times herein), agreed to the study-leave grant for Centeno. At that time, the Governor advised Centeno that he would be reimbursed for all expenses in connection with the study leave.[1]

Pursuant to approval of the study leave, the sum of $3,000.00 was specifically set aside by Miscellaneous Encumbrance Document No. 0141-75, dated December 30, 1974,[2] "to encumber funds covering Tuition, Travel, Per diem, etc., in favor of Juan Centeno." The Contract for Study Leave,[3] was duly executed on December 31, 1974, by the Commissioner of Public Works, the Director of Personnel, and the Commissioner of Property and Procurement on behalf of the Government of the Virgin Islands, and by Centeno. Governor Evans signed and approved the contract, and the Director of the Budget initialled the contract. Significantly, the account number of the Miscellaneous Encumbrance Document encumbering the funds to

---

[1] Transcript, P. 17, li. 19–21.

[2] Plaintiff's Exhibit No. 4 in evidence.

[3] Plaintiff's Exhibit No. 2 in evidence.

cover Centeno's expenses was noted on the contract under the Budget Director's initials.

The term of the contract for study leave was from January 1, 1975 to December 31, 1975. The contract stipulated that Centeno would be paid all of his salary for the period of the study leave, plus reimbursement *"for all or part* of the necessary expenses of the student including the necessary costs of:

(a) travel and per diem in lieu of subsistence;

(b) tuition and matriculation fees;

(c) library and laboratory services;

(d) purchase or rental of books, materials and supplies; and

(e) other services or facilities directly related to the training." (Emphasis added.)

The contract obligated Centeno to faithfully and studiously apply himself to the study of Business Administration at Jones College, Jacksonville, Florida, for one year and, upon completion, to return and resume in government service for at least one year. The contract further stipulated that failure to resume his government service would make him and his estate liable to the Government for his salary and expenses incurred in training.

In reliance on the one-year contract, in January, 1975, Centeno moved to Florida, enrolled in Jones College, bought books, and paid his tuition for Business Administration courses. Additionally, he transferred his family to Florida, enrolling his children in Florida schools.

In February, 1975, Centeno received a letter from the *new* Commissioner of Public Works (Honorable Gordon Finch), stating that the *new* Governor (Honorable Cyril E. King), had directed that Centeno's assignment to training duty at Jones College be terminated, and that

Centeno be reassigned to active duty in St. Croix.[4] Centeno, having failed to respond to this communication, received a second letter from the Commissioner of Public Works in March, 1975,[5] stating that his study contract had been "nullified on the basis of insufficient funds," and requiring him to report to active duty in St. Croix within two weeks, in default of which his employment would be terminated. Centeno failed to return to St. Croix, and on April 1, 1975,[6] was allegedly terminated for his refusal to accept the unilateral nullification of his study leave contract and return to active duty on St. Croix.

Centeno completed his year at Jones College, but received no money, either in salary or expenses, pursuant to the contract or otherwise. Although Centeno had been prepared to return to his employment at the conclusion of his one year study leave, as a result of the April 1 termination letter, he did not do so. At the end of the one-year period, he voluntarily elected to continue his course of study at Jones College, but testified that he remains willing, and is even now prepared, to return if permitted.

Having now established the basic facts of the matter, it is appropriate to apply the law to these facts and resolve the rights of the parties. The first issue presented is the original validity of the contract and the right of the Government to unilaterally terminate it.

The contract provides that it is made in accordance with 3 V.I.C. §§ 677, 679, 681, and 690. Title 3, section 677 provides that:

---

[4] Through inadvertence, this exhibit was marked Government's Exhibit No. 6, although it actually was plaintiff's exhibit No. 6 and should have been so marked. The Government's motion to correct that exhibit by adding to plaintiff's exhibit No. 6 in evidence the letter of the Governor referred to therein is denied because it was not supplied to the Court, even after trial, and for the more important reason that even assuming the Governor's directive to have asserted insufficiency of funds as a basis for his action, no change in the ultimate conclusion would be accomplished.

[5] Defendant's Exhibit A in evidence.

[6] Defendant's Exhibit B in evidence.

(a) In addition to any other training provided for under this subchapter, the Governor, upon recommendations of executive department heads, *shall* grant study leave each year to one employee of each agency . . . for the purpose of pursuing advanced training courses and programs within or outside the Virgin Islands. (Emphasis added.)

(c) Any employee granted study leave under this section shall receive his salary . . .

Title 3, section 679, provides for payment of expenses of training and in relevant part provides for payment or reimbursement for *all or a part* of the necessary expenses of training, including:

(a) travel and per diem in lieu of subsistence;
(b) tuition and matriculation fees;
(c) library and laboratory services;
(d) purchase or rental of books, materials, and supplies;

Additionally, section 679 provides that:

(b) Only monies appropriated to an agency specifically for training may be used therefor, and savings accrued in its annual operating budgets may be expended for the purposes of training only after approved by the Governor and by the Finance Committee of the Legislature.

Section 681, in pertinent part, provides that an employee selected for training *shall* agree in writing to:

(1) continue in the service of the Government after the end of the training period for a period at least equal to the length of the training period unless he is involuntarily separated from the government service.

While section 690 gives the Governor the power to except any agency or employee or group of employees from this subchapter, such authority is meaningless insofar as the determination of this case is concerned.

The Contract for Study Leave is a creature of the legislature. The Government does not attack the validity of

the contract which, is a standard contract, closely tracking the applicable statutory language. The legislature has mandated that the Governor grant study leaves and pay the employee's salary while on study leave. In the case at bar, the Government's attack is directed only to the funding for Juan Centeno's study leave, contending that his contract was invalid ab initio because the training monies were not *specifically appropriated* training funds as required by 3 V.I.C. § 679(b), supra. The argument continues that since the monies set aside for Centeno's study leave either were not appropriated specifically for training, or, if derived from accrued savings, were not approved for training purposes by the Governor and the Finance Committee, then the contract was in violation of Chapter 25 and thus "null and ineffective."

The testimony in the case sub judice made clear that the monies set aside for Centeno's study leave were appropriated specifically for training. The Government's own witness, the Chief Programmer of MED Systems in the Office of the Director of the Budget, conceded that while there was no line item adopted specifically for a study leave for Juan Centeno, the legislature did appropriate monies to an integrated budgetary request from the Department of Public Works.

As is clear from the following quoted colloquy,[7] the request for Centeno's study leave expenses was included in the larger category of "Other Grants and Contributions," rather than submitted separately as a line item:

Q Let me just ask you: Are training funds separate line items in the budget?

A In general, yes. They come under other grants and contributions.

Q In 1974—

[7] Transcript, P. 43, li. 12–25 and P. 44, li. 1–16.

THE COURT: Let me just stop you for a moment. Mr. Joseph, I'm not sure I understand your answer and I want to be sure I do understand it. When we talk about a separate line item budget which comes under other grants and contributions, are you telling me that you have a total number for grants and contributions, under which there is a breakdown of what the grants and contributions consist of?

THE WITNESS: Generally, yes. The other grants and contributions, under which there is no breakdown in the budget as it is passed, there is a breakdown in the proposed document supporting the Legislature's request.

THE COURT: What this comes down to is that the department head submits a request and he justifies his request by breaking down each particular item in one of several categories, such as grants and contributions, personnel salaries, personal services, equipment, or whatever, and that then is integrated into a single budgetary request?

THE WITNESS: Yes.

THE COURT: And that grouping is what is submitted to the Legislature and eventually approved by the Legislature?

THE WITNESS: Yes.

This Court finds as a fact that the monies set aside for the use of Juan Centeno were properly appropriated in compliance with 3 V.I.C. § 679, and as a matter of law that the Contract for Study Leave was valid when signed.

The second issue to be resolved in this case is whether the Government may terminate the contract at any time it chooses. The Government urges two arguments: First, that the contract was terminable because of lack of availability of funds appropriated for such purpose; and, Second, that since Centeno was serving at the pleasure of the administration, he was subject to dismissal at the pleasure of the administration and, thus, that the contract ended with his firing.

■ Both of these arguments only serve to mask the real reason for Centeno's firing. In the Government's Post Trial

175

Memorandum, defendant inserts a "Commentary," unsupported by any evidence before the Court, in which it designates Centeno as "a political and unclassified appointee of a lame duck Governor" whose "sham political ploys so brazenly employed," "cannot help but contaminate the contract." Such remarks, however, are improper, having no support in the record, and point clearly to the fact that Centeno was fired for political reasons, as the appointee of the past administration.

In Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), the Supreme Court held that patronage dismissals severely restrict political belief and association, the core of those activities protected by the First Amendment. The Court limited patronage dismissals to policy-making positions and stated guidelines to follow in determining whether or not an employee was in such a position:

> No clear line can be drawn between policymaking and nonpolicymaking positions. While nonpolicymaking individuals usually have limited responsibility, that is not to say that one with a number of responsibilities is necessarily in a policymaking position. The nature of the responsibilities is critical. Employee supervisors, for example, may have many responsibilities, but those responsibilities may have only limited and well-defined objectives. An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position. In determining whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals. . . . Since, as we have noted, it is the Government's burden to demonstrate an overriding interest in order to validate an encroachment on protected interests, the burden of establishing this justification as to any particular respondent will rest on the petitioners on remand, cases of doubt being resolved in favor of the particular respondent. Elrod v. Burns, supra, at 2687.

The Government in the case at bar has not presented any evidence to show that Centeno was in a policymaking position. That failure alone would require this Court to resolve the doubt in favor of Centeno. However, it cannot even be argued that Centeno, while serving on a valid study leave in Florida, was in *any* way involved in policy decisions where his loyalty to the new administration would affect the efficiency and effectiveness of the Government. In fact, the study leave program was created by the Legislature to provide for continuity and efficiency in government[8] as opposed to the elimination of "lame duck appointees."

This Court cannot condone firings based solely upon political affiliation, and could decide this case in favor of Centeno on the strength of those decisions which hold that, ordinarily, discrimination by reason of political affiliation is proscribed by the Constitution. Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Elrod v. Burns, supra; Illinois State Employees Union v. Lewis, 473 F.2d 561 (7th Cir. 1972), cert. den. 410 U.S. 943, 93 S.Ct. 1370, 35 L.Ed.2d 609 (1973); Pedroza Gabriel v. Benitez, 390 F.Supp. 988 (D.C.P.R. 1975).

However, rather than bottom my conclusion on so narrow an issue, I prefer to reach the conclusion in favor of the plaintiff Centeno exclusive of the political issue.

The Government contends that the alleged lack of available funds to pay for Centeno's study leave is a result of the fiscal crisis suffered by the Virgin Islands Government in the third quarter of the 1974–75 fiscal year, and further that paragraph 6 of the contract itself, to wit:

6. This agreement is subject to the availability of funds appropriated for such purpose,

---

[8] 3 V.I.C. 671.

authorized the Governor or the Commissioner of Public Works to "nullify" Centeno's leave on the basis of insufficient funds. The Government's reliance on these bald assertions as an absolute defense to Centeno's right to be paid under the terms of the contract is misplaced.

There is no evidence that there was an unavailability of funds to pay Centeno. Although the Court took judicial notice of the fact that the Government suffered a fiscal crisis about the time Centeno was granted study leave, and there was evidence that the Department of Public Works sustained a 25% reduction in funds allotted for the third quarter of fiscal year 1974–75, the testimony of the Government's witness from the Office of the Director of the Budget was clear that the funds for Centeno's salary and expenses were set aside and available for that fiscal year.[9] Those funds were not affected by the fiscal crisis.

This Court finds that the salary and expense monies were available and that the Government's reliance on Clause No. 6 affords it no defense.

■ Finally, the Government contends that since Centeno served in an appointed, exempt position at the pleasure of the Governor, he remained subject to dismissal at any

---

[9] "Q. Tell the Court, please, from your knowledge, what it means when the Director of the Budget initials that document?

A You'll notice on the contract, and also on the MED, an MED number, which sets aside the funds, the extent of which the Budget Director is saying is available.

Q In other words, the Budget Director is saying that the salary and $3,000 is presently available for this contract?

A The initialling—the Budget Director is saying that the funds set aside under MED are available, yes; that the funds for the contract are available to the end of that fiscal year.

Q Did there ever come a time when the position of Director of Administration in St. Croix was ever deleted from the budget in either fiscal year 1974 to '75 or '75 to '76?

A Not to the best of my knowledge.

Q As a matter of fact, the funds to pay that salary are still in the budget and regularly appropriated, are they not?

A Yes, To the best of my knowledge, yes."

(Transcript P. 55, li. 9–25, P. 56, li. 1–2.)

178

time. The Government ignores the fact that it had contracted with Centeno for a one-year study leave.

The ordinary rule to be followed is that absent contractual, legislative or constitutional provision on the subject, the power of removal is incident to the power of the appointment, and government employment can be revoked at the will of the appointing officer. Harnett v. Ulett, 466 F.2d 113 (8th Cir. 1972); Connealy v. Walsh, 412 F.Supp. 146 (W.D. Mo. 1976); State Ex Rel. Raslavsky v. Bonvouloir, 355 A.2d 275 (Conn. 1974). However, Centeno duly contracted with the Government, consideration flowing on each side. Centeno relied on the contract and moved to Florida in pursuance of his part of the bargain. A contractual relationship which fixed his term of employment for at least one year thereupon arose. The law is clear that:

Where the term or tenure is fixed for a definite period of time, (however,) the power to remove at will cannot be implied and such appointee may be removed only for cause and not without notice and an opportunity to be heard. State Ex Rel. Raslavsky v. Bonvouloir, supra, at 278 and authorities cited therein.

There is no pretense that Centeno was terminated for cause. In the context of a public official, cause means essentially:

"such cause as is 'plainly sufficient under the law and sound public policy'" and has "reference to a substantial cause touching qualifications appropriate to the office or employment or to its administration." . . . It also necessarily implies such degree of misconduct or culpability on the part of the office holder as clearly implicates the public interest in precluding his continuance in that particular office. Golaine v. Cardinale, 361 A.2d 593, 598 (N.J.Super. 1976).

Centeno's employment was terminated when he refused to accept the Government's attempt to "nullify" his one-year contract for study leave. There was nothing alleged touching on either his qualifications or misconduct in office.

179

The Court finds that Centeno was wrongfully dismissed from his employment.

The law is clear that improperly dismissed public employees are entitled to recover salary accruing during that period of improper removal. McKeithen v. City of Stamford, 183 A.2d 280 (Conn. 1962); Oliver v. Spitz, 348 P.2d 158 (Nev. 1960); Vega v. Borough of Burgettstown, 147 A.2d 620 (Pa. 1958). Centeno is entitled to his salary of $19,596.00 for the one-year period January 1, 1975 to December 31, 1975, pursuant to the study-leave contract. After December 31, 1975, however, Centeno was no longer under any contractual protection and as an appointee subject to dismissal at the pleasure of the appointing power, should have considered his employment terminated and, in fact, did, as will be noted, supra (Page 172).

 The Contract for Study Leave, as prepared by the Government of the Virgin Islands, contains an ambiguous phrase as to what portion of necessary expenses will be reimbursed. Like its empowering statute, 3 V.I.C. § 679, supra, it contracts for reimbursement "for *all or part* of the necessary expenses of the student . . ." (Emphasis added.) An ambiguous document must be construed against its author. Walter v. Netherlands Mead, N.V., 9 V.I. 438, 461 (D.C.V.I. 1973); Restatement, Contracts, § 236(d). The fact that the Government is a contracting party does not preclude the rule that construes language against the party using it. Vitex Mfg. Co., Ltd. v. Government, 5 V.I. 429, 351 F.2d 313 (3rd Cir. 1965). The Court must apply the parol evidence rule, Restatement, Contracts, § 242 to determine the common knowledge and understanding of the parties as to what part of the expenses would be paid. Centeno testified without objection that Governor Evans told him he would be reimbursed for *all* expenses in connection with the study leave. The Miscellaneous Encum-

brance Document (MED) encumbered funds for "tuition, travel, per diem, etc." up to $3,000.00.

The Court finds that Centeno is entitled to all expenses he has undertaken in connection with the Contract for Study Leave. The burden of proving those expenses is on the plaintiff, not by way of speculation, but by a preponderance of the evidence. Plaintiff has submitted receipts, all of which are supported by his testimony, for expenses he incurred amounting to $2,450.76,[10] consisting of round trip plane ticket, $232.36; hotel, $60.96; registration fee, $60.00; tuition, $1,879.00; and books, $218.44. The Court awards Centeno $2,450.76 for expenses incurred under the contract and $19,596.00 for his salary for one year under the study leave.

The Court took the defendant's motion to dismiss under advisement pursuant to Rule 41. Defendant's motion is denied for the reasons herein stated.

### JUDGMENT

In accordance with the reasons set forth in the Memorandum Opinion of even date, it is hereby

ORDERED, ADJUDGED AND DECREED that Plaintiff have judgment against the Defendant in the sum of $22,046.76, together with interest thereon at the rate of 6% per annum from January 1, 1975 to June 30, 1975, and at the rate of 9% per annum from July 1, 1975 to the date of satisfaction thereof, together with his costs in this action in the sum of $43.00.

Unless counsel can agree on the issue of attorney's fees, upon the submission of an affidavit by Plaintiff's counsel and any responsive pleadings in opposition thereto by Defendant's counsel, or upon an appropriate motion for a

---

[10] Plaintiff's Exhibit No. 5 in evidence.

hearing on the issue of attorney's fees, the Court shall award attorney's fees in accordance with the Estien guidelines.