678 F.2d 1176
 Herbert E. LOCKHART, Beryl L. Hastie, Gertrude L. Melchior,
Kaj H. Peterson, Kathleen P. Goldberg, and Beryl
I. Haygood, Appellants,
v.
HOLIDAY HOMES OF ST. JOHN, INC., Appellee.
 No. 82-3032.
 United States Court of Appeals,
Third Circuit.
 Argued April 26, 1982.
Decided May 24, 1982.
 
 John G. Short, Dudley Dudley & Topper, Charlotte Amalie, St. Thomas, V. I., for appellants.
 Charles S. Bolz, Law Offices of Edith L. Bornn, Charlotte Amalie, St. Thomas, V. I., for appellee.
 Before GARTH, Circuit Judge, ROSENN, Senior Circuit Judge, and HIGGINBOTHAM, Circuit Judge.
 OPINION OF THE COURT
 GARTH, Circuit Judge.
 
 
 1
 Herbert Lockhart and several other individuals ("the owners") appeal from a judgment of the district court holding them liable to Holiday Homes of St. John, Inc., a real estate agency, for payment of a brokerage commission in connection with the sale of a parcel of the owners' land. The owners had signed a brokerage agreement with Holiday Homes giving the latter the "exclusive right to sell" the property and promising payment of a commission "in the event the realtor ... procures a prospect." After the owners consummated a sale of their land, allegedly on their own and without Holiday Homes' assistance, Holiday Homes brought suit, claiming that the brokerage contract entitled it to a commission even if the owners themselves sold the property. The district court agreed and awarded judgment to Holiday Homes.
 
 
 2
 Because we believe that the district court's interpretation of the phrase "exclusive right to sell" is supported neither by the applicable law nor by the evidence in this record, we will reverse the district court's judgment in favor of Holiday Homes. Before the district court, however, Holiday Homes presented an alternative argument-that it did in fact procure a buyer for the owners' land. As the district court did not reach this issue in light of its ruling on the meaning of the phrase "exclusive right to sell," we will remand the case to the district court for decision on the question whether Holiday Homes in fact procured a buyer for the owners and so is entitled to a commission.I.
 
 
 3
 For a number of years, the Land Acquisition Division of the United States National Park Service had discussed with the owners the possibility of purchasing a parcel of shoreline property which Lockhart and the others owned, but the parties were unable to come to an agreement as to price. On August 21, 1978, the owners, dissatisfied with the state of the negotiations with the Park Service, signed a brokerage contract with Holiday Homes. The agreement was a form contract, supplied by Holiday Homes, with blanks left for certain terms such as the size of the commission and the duration of the agreement; these terms were negotiated by the owners' attorney, who was present at the signing of the contract. The agreement provided in part that
 
 
 4
 I, the Owner of the real estate described above, ... hereby authorize HOLIDAY HOMES OF ST. JOHN, INC. (hereafter called REALTOR) to act as Agent and to render such personal and professional services as is deemed necessary for the sale of the real estate ... under the terms stated herein on an Exclusive Right to Sell bassis (sic). I certify that I have cancelled or terminated other listing agreements or broker contracts for the sale of this property.
 
 
 5
 THIS AGENCY WILL EXPIRE Nov. 21, 1978.
 
 
 6
 In the event the REALTOR named procures a prospect, ready, willing and able to purchase the said real estate during the period of this agency, or any extension or renewal thereof, for the price and terms stated in the property description, or for any other price and terms acceptable to the Owner, the Realtor's sale commission shall be deemed to have been earned and I agree to pay the said Realtor, at closing, an amount equal to 6% of the gross selling price as the Realtor's commission earned and due.
 
 Appendix at 13.[1]
 
 7
 What happened after the contract was signed is a matter of dispute between the parties, a dispute which the district court found unnecessary to resolve in light of its interpretation of the contract. In essence, Holiday Homes claimed before the district court that in late August or early September of 1978 it showed the property to one Janet Adams. With the aid of Holiday Homes, Adams began to make arrangements for the purchase of the property by herself and her business associates, though-out of her concern for the environment-she preferred that the National Park Service acquire the property and thereby safeguard it from commercial development. In fact, according to Holiday Homes, by contacting various officials in Washington, and by holding out the prospect of a private acquisition of the property, Adams spurred the Park Service on to sign a purchase agreement with the owners, at a price that exceeded the Park Service's earlier offers by over a million dollars. See generally Appendix at 98-107 (Plaintiff's Proposed Findings of Fact and Conclusions of Law Before the District Court).
 
 
 8
 The owners presented a sharply different picture of the events to the district court. Although they did not know it at the time, the owners argued, the Park Service had in fact already decided by August 21, 1978 (when the brokerage contract was signed), to purchase their land at the price that the owners had been demanding. Whatever communications Adams engaged in with federal officials,[2] then, had no effect on the Park Service's decision to buy the property. Further, the owners contended, Adams was acting on her own-she was not an employee of Holiday Homes-and so Holiday Homes could not be said to have procured a buyer.
 
 
 9
 Though the preceding events were the subject of much disagreement between the parties, there was no dispute that, as the district court found,
 
 
 10
 (o)n September 27, 1978 the defendants entered into a contract with the Park Service for the sale of the Property for $3,995,000.... Upon learning of the sale of the property, the plaintiff made a demand to the defendants for his commission which, at 6% of the selling price, amounts to $239,700. The defendants refused to pay the commission to the plaintiff.
 
 
 11
 Appendix at 112. Thus, on August 8, 1979, Holiday Homes filed a complaint in federal district court alleging that the owners had breached the brokerage contract. After a bench trial conducted on November 21, 1980, the district court issued its findings of fact and conclusions of law on January 23, 1981.
 
 
 12
 In its opinion, the district court did not pass upon any of the factual disputes concerning Holiday Homes' efforts to secure a buyer. Instead, the district court accepted a second argument that Holiday Homes made, which was that under an "exclusive right to sell" contract, the broker is entitled to a commission regardless of who-that broker, another one, or the owner himself-actually brought about the sale. The district court held that this interpretation of the contract was correct as a matter of law, and, in awarding judgment for Holiday Homes, rejected two counter-arguments that the owners put forth.
 
 
 13
 First, the owners argued that they had in fact understood the contract, including the phrase "exclusive right to sell," to mean that they could engage no other real estate agent, but that they, the owners, were nevertheless free to find a buyer through their own efforts and sell the property themselves. To this the district court replied that the question of the defendants' actual understanding of the phrase "exclusive right to sell" was irrelevant:
 
 
 14
 A unilateral mistake or ignorance as to the meaning of an objectively understandable and well known term, placed in capital letters, and located in a one page document, is not a basis for avoiding the terms of a contract.... There is no reason why the defendants should be afforded relief from this general rule regarding unilateral mistakes as the defendants were not "unwary and unsophisticated" and induced by "fraud, duress, or coercion" to sign the brokerage agreement, but in fact had engaged in real estate transactions in the past and were represented and advised by an attorney who had the obligation to scrutinize the contract and advise his clients as to its import.
 
 
 15
 Appendix at 114.
 
 
 16
 Second, the owners argued that the language in the contract concerning payment of a commission "in the event the realtor procures a prospect" rendered the contract ambiguous. Even if by itself the phrase "exclusive right to sell" clearly and unambiguously meant "exclusive of everyone, even the owners," rather than (as the owners contended) "exclusive of other brokers," the contract as a whole was ambiguous because it also contained language that seemed to require that Holiday Homes actually procure a willing buyer in order to be entitled to a commission. The district court rejected this argument as well, holding that the two provisions should be read consistently with each other:(T)his Court does not agree that the contract is rendered ambiguous by a statement which sets forth the basis on which the broker can earn his commission. The recital stating that the broker must procure a buyer "ready, willing and able" to purchase the property in order to earn his commission is consistent with an exclusive right to sell, as the former states the basis by which the broker can "earn" his commission, while the latter specifies the circumstances by which the broker is entitled to his commission regardless of whether he in fact "earned" it by procuring the buyer.
 
 
 17
 Appendix at 114-15.
 
 
 18
 Thus, on July 13, 1981, the district court entered judgment in favor of Holiday Homes in the sum of $239,700.00, together with prejudgment interest, costs, and attorneys fees. The district court, for reasons not here relevant, entered an amended judgment on September 16, 1981. On September 29, 1981, the owners filed a timely notice of appeal from the district court's judgment, see Fed.R.App.P. 4(a)(4).
 
 II.
 
 19
 The district court, as noted, held that the contract was "clear and unambiguous" in providing that a sale of the property by anyone-Holiday Homes, another broker, or the owners-would entitle Holiday Homes to a commission. The phrase "exclusive right to sell," the district court ruled, has an objectively ascertainable meaning to that effect, a meaning that was not rendered ambiguous by inclusion of the phrase referring to payment of the commission in the event the broker procured a buyer. We cannot agree with the district court's analysis, however, for we think that the contract in this case was ambiguous.
 
 
 20
 We reach this conclusion for two reasons. First, even taken alone, the phrase "exclusive right to sell" is in our view ambiguous. The ambiguity arises from the fact that the word "exclusive" by itself does not specify precisely whom it excludes: was the "right to sell" that was given to Holiday Homes intended to be exclusive only of other brokers, or exclusive of the owner as well? The phrase "exclusive right to sell" simply has nothing to say on this key question.
 
 
 21
 Our conclusion that the phrase itself is ambiguous is bolstered by the numerous cases which hold that inclusion of a reference to an "exclusive right to sell" in a brokerage contract does not by itself answer the question whether the contract entitles the real estate agent to a commission even if the owner sells the property entirely through his own efforts. In Foltz v. Begnoche, 222 Kan. 383, 565 P.2d 592 (1977),[3] for example, the owner signed an "Exclusive Listing Agreement" giving the broker "the exclusive right ... to sell" the property, and providing that "if you (the realtor) produce a purchaser ready, willing and able to purchase the property, ... I agree to pay you a 6% commission," 565 P.2d at 594. After the owner sold the property himself and refused to pay the commission, the realtor brought suit; the trial court held in favor of the owner. On appeal, the Kansas Supreme Court was presented with the question whether "as a matter of law," the realtor was entitled to the commission. In affirming the trial court's judgment, the Court specifically held that "use of the phrase 'exclusive right,' standing alone, should not be determinative in creating" an entitlement under the contract for the broker to receive a commission where the owner finds a buyer himself. Accord, Peeler Insurance & Realty, Inc. v. Harmon, 20 N.C.App. 39, 200 S.E.2d 443, 445 (1973) ("mere use of this term ("exclusive right to sell") should not be determinative"). See generally Annotation, "Exclusive Right to Sell" and Other Terms in Real-Estate Brokers' Contract as Excluding Owner's Right of Sale, 88 A.L.R.2d 936, 941 (1963) ("some courts state, and most imply, that the label ("exclusive right to sell") used in the contract itself is far from determinative").
 
 
 22
 The second basis for our conclusion that the contract in this case is ambiguous is the context in which the phrase "exclusive right to sell" was employed. The sentence immediately following that phrase stated that
 
 
 23
 I (the owner) certify that I have cancelled or terminated other listing agreements or broker contracts for the sale of this property.
 
 
 24
 Though the contract thus explicitly made it clear that no other real estate agent could be engaged, it was silent as to the question of whether the owners relinquished as well their right to sell their property through their own efforts. In this respect, too, the language of the contract neither required nor excluded the interpretation offered by Holiday Homes, and so was ambiguous.
 
 
 25
 Furthermore, in the fourth paragraph of the contract, there was, as previously noted, a promise by the owner to pay a six percent commission "(i)n the event the realtor ... procures a prospect, ready, willing and able to purchase the said real estate." The district court correctly recognized that this provision was not entirely consistent with an interpretation of the phrase "exclusive right to sell" as entitling the broker to a commission upon the sale of the property by anyone, no matter who found the buyer. Rather than concluding from that inconsistency alone that the contract was ambiguous, however, the district court attempted to resolve the ambiguity on its own. According to the district court, by signing the brokerage contract in this case the owners agreed that Holiday Homes would be due a commission either if it "earned" it or if it were "otherwise entitled" to it. Holiday Homes would "earn" the commission by actually procuring a willing buyer (regardless of whether a sale was in fact consummated), and would be "otherwise entitled" to the commission if another broker or the owners themselves, rather than Holiday Homes, found someone who bought the land.
 
 
 26
 The district court's interpretation certainly is one possible way to understand the agreement in this case. But it is not the only way, and therein lies our disagreement with the district court. Under precisely what circumstances would Holiday Homes be "entitled" to a commission even if it had not "earned" it? On this, the contract is silent. A reading of the contract whereby the owners retained the right to find a buyer for the property on their own, but agreed that Holiday Homes would be the only real estate agent they would engage, would be at least as plausible as the reading offered by the district court. Precisely for that reason, the contract in this case cannot be said to have been "clear and unambiguous." See Robert v. Construction General, Inc., 40 Md.App. 78, 388 A.2d 168, 173-74 (1978) (contract granting broker "exclusive right to sell" and setting commission was "completely silent ... as to the owner's right to sell the property without liability for a commission;" court holds that phrase "exclusive right to sell" is not determinative and that the broker was not entitled to a commission when the owner sold the land through his own efforts).[4]
 
 
 27
 We recognize that there are some cases which might appear contrary to our holding, but most of them are distinguishable on their facts. For example, in Berven Co. v. Newman, 281 N.W.2d 268 (S.D.1979), the owner signed an agreement granting the broker an "exclusive right sell the property," and, after the owner sold it herself and refused to pay commission, the realtor brought suit and was awarded judgment, which the South Dakota Supreme Court upheld on appeal. In that case, however, the contract was a model of clarity compared to the one in the present case, providing that
 
 
 28
 (t)his agreement gives to my Agent the sole and exclusive right to sell the property described. If said property is sold during the term of this agreement, at a price and upon terms acceptable to me, to a purchaser procured by me or by any other Agents or Agencies, or by any other party whomsoever, I agree to pay the Agent designated in this agreement, forthwith the amount of commission provided herein.
 
 
 29
 Id. at 269-70. See Brown v. Miller, 45 Ill.App.3d 970, 4 Ill.Dec. 649, 360 N.E.2d 585, 586 (1977) (where the words "if sold by you, myself, or any other broker" appear in the contract, owner is liable for commission even if he sells the property himself; where such express language is absent, owner retains right to sell the property to buyer he himself procures). Cf. Bolger v. Danley Lumber Co., 77 Ill.App.3d 207, 32 Ill.Dec. 685, 395 N.E.2d 1066, 1069 (1979) (brokerage contract stating that realtor is to receive commission upon sale of the property by the realtor, the owner, or any other person entitles broker to commission upon sale regardless of who was the "procuring cause"), De Boer v. Geib, 255 Mich. 542, 238 N.W. 226, 226 (1931) (same holding where contract promises commission if property is sold "by you, by myself or any other person").[5]
 
 
 30
 We are not persuaded by the reasoning of Covino v. Pfeffer, 160 Conn. 212, 276 A.2d 895 (1970), on which the district court relied. Though the language of the contract in that case is not quoted verbatim, it appears from the opinion of the Connecticut Supreme Court that it was quite similar to the language of the agreement here. See Covino, supra, 276 A.2d at 896. There, too, the owner sold the property himself and the broker demanded a commission. The Connecticut Supreme Court held that as a matter of law,(t)he owner in a contract giving a broker the exclusive sale of property agrees that he will not sell his property during the life of the contract to any purchaser not procured by the broker.... The owner agrees not only to exclude another agent, but also himself from procuring a purchaser.... The broker is entitled to his commission as damages for the breach of an exclusive sale contract, if during the life of such a contract, the owner sells the property to a purchaser procured by his own efforts, or by other agents, or if the broker during such period produced a customer ready, able and willing to buy the property.
 
 
 31
 276 A.2d at 897. The court justified its holding by arguing that "(t)o place any other interpretation on the meaning of 'sale' in an exclusive sale contract would encourage connivance." Id.
 
 
 32
 We decline to follow the holding of Covino, and of any other similar cases.[6] To be sure, a broker does have a legitimate concern over the possibility of "connivance" between an owner and a prospective buyer procured by the broker, but we think that that concern is irrelevant to the question presented here: to what did the parties agree? The contract in this case could have included a provision explicitly dealing with the question of the owners' right to sell the property through their own efforts; it did not, but instead made use of language that is capable of differing interpretations. As such, the contract cannot be deemed, as the district court held it to be, "clear and unambiguous." Accordingly, we hold that the district court erred in ruling that as a matter of law the contract between the owners and Holiday Homes entitled the latter to a commission even if the owners found a buyer through their own efforts.
 
 III.
 
 33
 Our conclusion that the contract did not as a matter of law entitle Holiday Homes to payment of a commission, even if the owners themselves procured a buyer, still leaves open the question of how this particular contract is to be interpreted. Did the parties in fact intend that the owners would relinquish not only their right to engage other brokers, but also their own right to sell the property, so long as the brokerage agreement was in effect? It appears that because the district court resolved the issue as a matter of law, it did not make any finding of fact on this issue.[7] Theoretically, we might therefore remand the case to the district court for a determination of whether the parties in this case did in fact intend that the "exclusive right to sell" be exclusive only of other brokers, as the owners contend, or exclusive of the owners as well, as Holiday Homes argues. However, though the interpretation of the terms of a particular contract is, being a matter of fact, primarily within the province of the district court, it is also the duty of this court to determine the legal sufficiency of the evidence presented to support a finding of fact. And upon reviewing the record before us, we have concluded that there is no evidence in this record which could support a finding that the parties actually intended that Holiday Homes be given a "right to sell" that was exclusive even of the owners' right to sell. Thus there is no need to remand the case to the district court for findings on this particular question.
 
 
 34
 Three distinct, though in this case complementary considerations persuade us to hold that the record here, insofar as it relates to the parties' intent in agreeing to an "exclusive right to sell," could not possibly support a finding of fact by the district court in Holiday Homes' favor. The first is the burden of proof, which was on the plaintiff Holiday Homes; the second is the principle that ambiguities in a contract should be resolved against the party who drafted it, which was Holiday Homes; and the third is the principle that a property owner should not be deemed to have relinquished the right to sell his own property unless there is "clear and unambiguous language within the four corners of the written brokerage contract" establishing that he intended to do so, see Foltz v. Begnoche, supra, 565 P.2d at 597. Before elaborating upon these considerations, however, it will be useful to summarize the evidence of the parties' intent that was adduced at trial.
 
 
 35
 At trial, Holiday Homes called a number of witnesses, five of whom gave testimony relating to the meaning of the phrase "exclusive right to sell." First, Holiday Homes called Herbert Lockhart, one of the owners. Lockhart testified that his attorney, George Dudley, Jr., had been present at the signing of the brokerage agreement and had advised the owners as to the terms of the contract. Appendix at 277-78, 296-97. Lockhart also testified, though, that he had no discussions with either Dudley or Peter Griffith, the president of Holiday Homes, concerning the particular phrase, "exclusive right to sell." Appendix at 279, 291. Finally, he testified that he had understood the contract to preclude him from using another agent, but not to prevent him from selling the property to a buyer he procured through his own efforts. Appendix at 293, 305-06.
 
 
 36
 The second witness called by plaintiff Holiday Homes was the owners' attorney, George Dudley, Jr. He testified that he had not called the owners' attention to the phrase "exclusive right to sell" because he did not believe it to have any "special or technical meaning for which I should have been on notice or should have inquired." Appendix at 328. He stated that he had understood the contract to mean only that "the Lockharts would not be allowed to have (their) property listed or sold by any other broker." Appendix at 312. The third witness called by Holiday Homes was Peter Griffith, its president. When asked, "What do you mean by 'exclusive right to sell'?" he replied,
 
 
 37
 "Exclusive right to sell" means that the broker has the exclusive right to sell that property within that period. Regardless of who sells it, he is entitled to his commission.
 
 
 38
 This arrangement, he continued, differed from an "exclusive agency," in which "the broker has the exclusive right to sell and another broker does not, but the owner can sell it himself." Appendix at 357-58.
 
 
 39
 The other two witnesses, unlike the first three, were not parties connected to this particular contract. Rather, they were real estate agents whom Holiday Homes called as experts on the meaning of the phrase "exclusive right to sell" within the real estate profession. The first one, Carol Griffin, testified that
 
 
 40
 The exclusive right to sell, as opposed to exclusive agency or open listing, is a very definite expressed contractual concept which means that a broker is entitled to commission when this property is sold, regardless of whomsoever shall sell the property.
 
 
 41
 When an agency is established between the broker and the principal for the sale of real property, we're talking about that, and that the broker will get the commission regardless of whomever sold the property, whether the owner himself, members of his family, a pussycat or any other party other than the broker sells, the broker who has the exclusive right to sell is deemed to have earned his commission.
 
 
 42
 Appendix at 390-91, 397-98. Similarly, Frank McLaughlin, the second real estate agent, stated in response to questioning by Holiday Homes' attorney:A My understanding of the term is that if (a broker has) an exclusive right to sell no one else has the right to sell the property except (the broker or his assigns) ...
 
 
 43
 Q And does that exclude the owner's right to sell?
 
 
 44
 A Absolutely.
 
 
 45
 Q And what if the owner should sell? What, in your opinion, is a consequence if the owner should directly sell the property during the period when it is listed under an exclusive right to sell contract?
 
 
 46
 A The broker is entitled to his commission, as stated in the agreement.
 
 
 47
 Appendix at 426.
 
 
 48
 In our view, there is nothing in this evidence which could suffice to support a finding of fact by the district court that the parties intended Holiday Homes to have a right to sell exclusive even of the owners' right. To begin with, the burden of proof in establishing the terms of the contract was on Holiday Homes, the plaintiff. Yet the testimony of two of the witnesses-the real estate agents-simply was not relevant to the question of what the parties intended to agree to by signing this particular contract. As the district court itself noted, Carol Griffin was not called "to testify what was in the minds of the owner of the property when they signed" the contract, Appendix at 387; nor did she (or could she) offer any testimony as to what Holiday Homes in particular intended when the agreement was signed; nor could she testify as an expert on the most likely interpretation that a reasonable person in the owners' position would place on the words in the contract. The other real estate agent also was not called, as the district court noted, to testify as to what the owners understood, or should reasonably have understood, by the phrase "exclusive right to sell;" rather, he testified as to its meaning in the real estate community. See Appendix at 424-25. Similarly, we find nothing in the testimony of the other three witnesses which could possibly support an assertion that the owners knew that Holiday Homes was interpreting the ambiguous phrase "exclusive right to sell" as entitling it to a commission even if the property were sold to a buyer procured by the owners. In essence, Griffith testified that he understood the phrase as having one meaning, while Lockhart and Dudley testified that they understood it as having a different one.[8]
 
 
 49
 Because the evidence which Holiday Homes presented to the district court was so deficient with respect to the parties' intent, we hold that as a matter of law Holiday Homes failed to satisfy its burden of proof on this issue. Our holding, we emphasize, is not grounded merely on a mechanical application of the principle that the burden of proof is on the plaintiff. On the contrary, we think that the other two principles of contract interpretation which we noted earlier provide strong support as a matter of policy for our holding.
 
 
 50
 One of those principles is that "(a)n ambiguous document must be construed against its author." E.g., Centeno v. King, 14 V.I. 168, 180 (1977). The contract which the parties used was a form contract supplied by Holiday Homes. It would have been a simple matter for Holiday Homes to have included in that form a provision explicitly dealing with the question of the broker's right to the commission in the event that the owners sold the property themselves. Holiday Homes, however, replies that it is inappropriate to resolve all ambiguities in the owners' favor because the present case is not one in which one party with vastly greater bargaining power presents to the other party on a "take it or leave it" basis a form contract with unfair, one-sided provisions. Here, Holiday Homes contends, "the owners were neither unsophisticated (n)or unwary and were, in fact, represented by counsel." Appellee's Brief at 8. Indeed, the district court expressly so found. Appendix at 114. Finally, Holiday Homes argues, given that the value of the land was around $4 million, the owners' attorney should have known, or through the competent practice of his professional skills discovered, the meaning of the phrase "exclusive right to sell."
 
 
 51
 We need not comment on the merits of any of these contentions, however, for we believe them to be irrelevant to the rationale underlying the rule calling for a resolution of ambiguity against the document's author. That rationale is simply stated: "doubtful and uncertain language in a contract is construed against the party preparing the contract, for he has created the troublesome ambiguity." Foltz v. Begnoche, supra, 565 P.2d at 597. In our opinion, the persuasive force of Holiday Homes' argument that the owners should have exercised greater care is vitiated by the fact that the same admonition could be directed with equal force to Holiday Homes itself. We see nothing unfair or incompatible with basic principles of contract law in resolving against Holiday Homes any ambiguities in a document that it chose to use as a basis for the brokerage agreement, especially where the particular ambiguity in this case could have been so easily avoided. See Stromberg v. Crowl, supra, 132 N.W.2d at 463 (source of problem is contract drafters' "unwilling(ness) to use clear and understandable language depriving the owner of his right to sell"); 3 A. Corbin, Contracts § 559 at 321 (1980 Supp.) (ambiguities should be resolved against author of a document where author "is in the business of using forms like this, and had the ability to do better-either to write a better form, or to appreciate the ambiguity and point it out to the other party").
 
 
 52
 The final consideration underlying our holding that Holiday Homes did not carry its burden of proof is the principle that an owner should not be deemed to have relinquished the right to sell his own property through his own efforts except by clear and unequivocal language in the contract. See, e.g., Peeler Insurance & Realty, Inc. v. Harmon, supra, 200 S.E.2d at 445 ("Since the right of alienation has become such an integral part of property, it is only proper that the contract specifically negative this right before it is lost."); Robert v. Construction General, Inc., supra, 388 A.2d at 172-74. Cf. Brown v. Miller, supra, 4 Ill.Dec. at 651, 360 N.E.2d at 587 (finding "exclusive right to sell" where "(t)he language of the agreement is clear in its limitation of the owner's right to dispose of the property during the existence of an agency") (quoting Dixon v. Betten, 2 Ill.App.3d 708, 712, 277 N.E.2d 355, 359 (1971)). We think such a principle best accords with the common expectation that most property owners would have in the absence of a clear indication to the contrary. Given this expectation, and given the typical owner's lack of knowledge of trade usages peculiar to the real estate profession, to adopt any less stringent standard of interpretation of brokerage agreements would pose an undue risk that an owner might unwittingly surrender his right to sell his own property. See Foltz v. Begnoche, supra, 565 P.2d at 597 (noting potential for misunderstanding posed by property owners' frequent "unfamiliar(ity) with the terminology of brokerage transactions").
 
 
 53
 In sum, we hold that the particular contract in this case left the owners free to procure a buyer through their own efforts, without liability to Holiday Homes for a brokerage commission.[9]
 
 IV.
 
 54
 As we have indicated, Holiday Homes also argued before the district court that it was in fact the "procuring cause" of the sale of the land to the National Park Service. See Appendix at 561. The district court did not pass on this contention, and we are in no position to do so ourselves. For example, there are a number of disputes as to exactly what happened with respect to Janet Adams' contacts with Park Service officials. Any remaining questions of contract interpretation, moreover, are for the district court to resolve in the first instance.
 
 
 55
 Accordingly, we will vacate in its entirety the district court's judgment of July 13, 1981, as amended in its order of September 16, 1981, and we will remand the case to the district court for further proceedings consistent with this opinion.
 
 
 56
 ROSENN, Circuit Judge, concurring.
 
 
 57
 I agree with the majority that the contract between the owners and Holiday Homes of St. John, Inc. (Holiday) does not entitle Holiday to a sales commission in the event that the owners procured the buyer. I reach that result, however, through a somewhat different line of reasoning predicated upon the strong dependency of the Virgin Islands legal system on the rules expressed in the Restatements of the American Law Institute.
 
 A.
 
 58
 The Virgin Islands Code establishes a hierarchy of sources of law for the Islands:
 
 
 59
 The rules of the common law, as expressed in the restatements of the law approved by the American Law Institute, and to the extent not so expressed, as generally understood and applied in the United States, shall be the rules of decision in the courts of the Virgin Islands in cases to which they apply, in the absence of local laws to the contrary.
 
 
 60
 V.I.Code tit. 1, § 4 (1957) (emphasis added). Thus, in the absence of Virgin Islands precedents or statutes to the contrary, courts are directed initially to the appropriate Restatement to ascertain the rules of decision to be applied in cases governed by Virgin Islands law. See Co-Build Companies, Inc. v. Virgin Islands Refinery Corp., 570 F.2d 492, 494 (3d Cir. 1978). Only where neither Virgin Islands decisional law nor the Restatements provide guidance should a court applying Virgin Islands law turn to established American common law principles.
 
 
 61
 Because there appears to be no relevant Virgin Islands precedent for the instant case, the Restatement (Second) of Agency (1958) provides the initial framework of our analysis. Section 448 of the Restatement sets out the general rule that an agent whose compensation is conditional upon his accomplishment of a specified result is entitled to the agreed compensation only if he is the effective cause accomplishing the result. Comment b to section 448 qualifies the general rule by identifying two exceptions to the principle that an agent must himself cause an event to occur in order to be entitled to compensation:
 
 
 62
 If the principal appoints the agent to an "exclusive agency" or grants him an exclusive right to sell, and thereafter in the first case the result is accomplished by another agent, or in the second case even by the principal himself, the agent is entitled to damages under the rules stated in the Comment on section 449.
 
 
 63
 Restatement (Second) of Agency § 448 comment b (1958). Despite the majority's conclusion to the contrary, the phrase "exclusive right to sell" is not, in light of the Restatement, inherently ambiguous. Under the Restatement, the granting to an agent of an exclusive right to sell a parcel of property entitles the agent to some form of damages in the event that the principal, rather than the agent, sells the property.[1]
 
 
 64
 That the concept of an exclusive right of sale is a well-defined legal principle does not, however, end our inquiry. For the Restatement also specifies that the mere inclusion of a phrase of art in an agency agreement does not perforce establish the unqualified right to compensation that attaches to an agent who has been given an exclusive right to sell. Comment c to section 449 of the Restatement provides in pertinent part, "The use of the words 'exclusive agency' or 'exclusive sale' is not conclusive but, as in other cases involving interpretation, all the circumstances must be considered." Thus, whether the owner is precluded personally from selling his own property must depend upon more than the simple use of the phrase of art; account must also be taken of the intent of the parties as revealed by the contract's entire language. This Comment is the only indication which the Restatement provides regarding the requisite formalities for establishing an exclusive agency or an exclusive right of sale. It is therefore appropriate at this juncture to turn to the decisional law of the United States for further guidance concerning the circumstances under which reference to exclusive sale in an agreement will be adequate to establish an exclusive right to sell in the agent-a right which precludes the owner from selling. A review of the body of decisional law reveals that courts have fashioned a rule of construction which disfavors preclusion of an owner's right to sell unless it is clear that this was the parties' intention.
 
 B.
 
 65
 In an overwhelming majority of cases involving the nature of the agency created under a brokerage agreement between an owner and a real estate agent, courts have required the agreement to expressly and unambiguously provide that the owner has agreed to pay his agent's commission even if the owner himself sells the property before they have recognized the creation of an exclusive right of sale.[2] "Only in this way can the often unwary and unsophisticated property owner be divested of his inherent right to sell land which he still owns." Bourgoin v. Fortier, 310 A.2d 618, 620 (Me.1973). Although courts have acknowledged that the phrase "exclusive right of sale" imports a specific type of agency, they have generally refused to give such language a rigid construction empowering the agent to sell to the exclusion of the owner merely because the phrase was incorporated in the brokerage agreement. Thus, agreements that provide that a broker has an exclusive right to sell but fail to expressly negative the owner's power of sale have been declared ambiguous and construed against the broker where elsewhere the agreement also provided that the broker was obligated to find a purchaser before he was entitled to his commission. See, e.g., Nicholas v. Bursley, 119 So.2d 722 (Fla.Dist.Ct.App.1960); Foltz v. Begnoche, 222 Kan. 383, 565 P.2d 592 (1977); cf. Bourgoin v. Fortier, supra, 310 A.2d 618 (use of phrase "exclusive listing" (synonymous with exclusive agency) in title of brokerage agreement created inconsistency with use of phrase "exclusive right of sale or exchange" in body of agreement).[3] Agreements held to create an exclusive right of sale almost invariably expressly provide that the commission is payable in the event of sale by the owner, the broker, or anyone else.[4]
 
 
 66
 The rationale for this de facto rule of construction disfavoring the recognition of exclusive rights of sale unless the agreement otherwise expressly negatives the owner's right of sale is suggested in Foltz v. Begnoche, 222 Kan. 383, 565 P.2d 592 (1977).
 
 
 67
 (W)e are persuaded that an "exclusive right to sell," by its very nature, should be created only by clear and unambiguous language. The owner of property frequently unfamiliar with the terminology of brokerage transactions should not be held to give up his right to sell his own property, unless the broker's contract in some way or other imposes liability upon the owner for payment of a commission in the event of a sale by the owner, either expressly or by the grant to the broker of such exclusive right as the court may deem necessarily implies such liability.
 
 
 68
 Id. at 388, 565 P.2d at 597.
 
 C.
 
 69
 The instant case presents two factors which might militate against applying this rule of construction to the agreement before us and reading the brokerage agreement, as the majority do, as establishing only an exclusive agency. First, although the agreement does not contain language to the effect that sale by anyone, including the owners, will result in liability for commissions, the words "Exclusive Right to Sell" are highlighted as terms having some special significance.[5] In agreements in which the phrase was found inadequate to establish an exclusive right of sale, it was sometimes simply incorporated in such a way as not to call attention to itself.[6] Second, the cases often involve sales of residential property by unsophisticated owners. In the present case, in contrast, the owners were represented by counsel in a significant commercial transaction.
 
 
 70
 Nonetheless, I am persuaded that the contract before us does not establish an exclusive right of sale. Even if we were to conclude that the owners should be charged with knowledge of the meaning of the phrase exclusive right of sale,[7] I believe that despite the use of the phrase "Exclusive Right of Sale basis" the contract remained ambiguous and, as such, should be construed against its drafter, Holiday. As the majority point out, a separate paragraph of the agreement provides:
 
 
 71
 In the event the REALTOR named procures a prospect, ready, willing and able to purchase the said real estate during the period of this agency or any extension or renewal thereof, for the price and terms stated in the property description, or for any other price and terms acceptable to the Owner, the Realtor's sale commission shall be deemed to have been earned and I agree to pay the said Realtor, at closing, an amount equal to 6% of the gross selling price as the Realtor's commission earned and due. (Emphasis added.)
 
 
 72
 As I read the quoted language, the latter part states that the Owner agrees to pay a commission of 6% of the gross selling price when the commission is deemed to have been earned; the former part states that the commission is deemed to have been earned in the event that Holiday Homes procured a ready, willing, and able prospect. Because this language is in conflict with an exclusive right of sale, I would resolve the conflict not, as the district court did, in favor of the realtor but rather, as the majority do, in favor of the owners and against the drafter of the agreement. Accord Nicholas v. Bursley, 119 So.2d 722 (Fla.Dist.Ct.App.1960); Foltz v. Begnoche, 222 Kan. 383, 565 P.2d 592 (1977).
 
 
 73
 I therefore concur.
 
 
 
 [1]
 The contract also specified a price for the land of $4,250,000. Thus, after deducting the 6% commission (which would amount to $255,000 on a selling price of $4,250,000), the owners would be left with a net of $3,995,000-the price which Lockhart testified was the net price the family wanted for the sale of the land, Appendix at 289, and at which the sale to the Park Service was in fact eventually made, allegedly without the aid of Holiday Homes
 
 
 [2]
 At trial, Holiday Homes introduced an internal Park Service memorandum, stating that a Park Service official had received a telephone call from Adams in which she claimed that "Lockhart has received a firm offer from a real estate firm in Miami to purchase the property for purpose of condominium construction." Appendix at 12. Both parties agree that in fact the owners had no such offer. Additionally, Holiday Homes denied that Adams had in fact made any representation to the Park Service that the owners had a firm offer from another buyer, and asserted that she had stated only that if the Park Service did not buy the land she and her associates, or some other private concerns, would purchase the land. Appendix at 103
 
 
 [3]
 1 V.I.C. § 4 provides:
 The rules of the common law, as expressed in the restatements of the law approved by the American Law Institute, and to the extent not so expressed, as generally understood and applied in the United States, shall be the rules of decision in the courts of the Virgin Islands in cases to which they apply, in the absence of local laws to the contrary.
 We are aware of no Virgin Islands cases dealing with the effect of the phrase "exclusive right to sell;" nor do the Restatements resolve the issue presented in this case, see note 5 infra. Thus we look to other sources of the common law "as generally understood and applied in the United States."
 
 
 [4]
 As we noted earlier, the district court held that the owners had made a "unilateral mistake" as to the meaning of the phrase "exclusive right to sell." To be sure, "(a) party's erroneous belief with respect to the law, as found in statute, regulation, judicial decision, or elsewhere, or with respect to the legal consequences of his acts" can constitute a "part of the total state of facts" about which a "mistake" may be made at the time a contract is entered into. Restatement (Second) of Contracts § 151, Comment b. In this case, however, our holding that the phrase "exclusive right to sell" does not as a matter of law have an "objectively understandable" meaning, see Appendix at 114, necessarily undermines the premise of the district court's conclusion that the owners had made a unilateral mistake. Cf. Ice Cube Delivery, Inc. v. Virgin Islands Water and Power Authority, 9 V.I. 197, 200 (1973) (plaintiff, through own negligence, mistakenly contracts for more electrical service than needed and later sues for refund; court holds that unilateral mistake "precludes relief for plaintiff from the effect of the natural meaning of the language" of the contract)
 
 
 [5]
 Though the district court cited the Restatement (Second) of Agency §§ 448 and 449 in support of its holding, we think that the Restatement is, like the cases discussed in the text above, completely consistent with our holding. Courts often draw a definitional distinction between two powers, an "exclusive agency" and "an exclusive right to sell." If the owner grants the broker the former he may sell the property himself without incurring liability, whereas if he grants the broker the latter power, he relinquishes not only his right to engage another broker, but his right to sell it himself. See Stromberg v. Crowl, 257 Iowa 348, 132 N.W.2d 462, 463-64 (1965). See generally Annotation, supra, 88 A.L.R.2d at 940-41
 In discussing the damages to which an agent may be entitled when the principal breaches the contract establishing the agency, the Restatement takes note of this distinction between the two types of powers that can be given an agent, one more inclusive than the other:
 The principal is subject to liability for the agreed compensation, if the agreement is interpreted as including a promise by him that the agent is to receive it upon the accomplishment of the result by another agent, in the case of an exclusive agency, or by the principal or another agent, in the case of an exclusive power.
 Restatement (Second) of Agency § 449, comment d.
 Another way to pose the issue in this case, then, is whether the parties agreed that Holiday Homes would have an "exclusive agency" (as the owners contend), or an "exclusive power" (as Holiday Homes contends). The definitions in the Restatement of these two types of agency, however, do not dispose of the contract law question of what language is needed clearly and unambiguously to create an "exclusive power." And, as we have noted in text, supra, the mere inclusion of the phrase "exclusive right to sell" is not sufficient to do so.
 
 
 [6]
 To the extent that Blankenship v. Kiehne, 240 Mo.App. 1197, 225 S.W.2d 166, 169 (1949), is in accord with Covino, we decline to follow it as well
 
 
 [7]
 Whether the district court did make such a finding of fact is somewhat unclear. In the section of its opinion entitled "Findings of Fact," the district court made no mention of any finding respecting the parties' actual intent. In its "Conclusions of Law," the district court did make reference to "the fact that the defendants (the owners) did not have actual knowledge of the meaning of the term 'exclusive right to sell'," but it did so in the context of holding that the owners' actual understanding of the phrase was "of no moment." Appendix at 214. Thus, the district court, having decided (as it remarked during the testimony) that "(t)he intent of the parties (cannot) override the plain language of the contract," Appendix at 337, apparently felt it unnecessary to make any finding as to what the parties actually intended
 
 
 [8]
 To be sure, the question of the parties' actual knowledge was not the only one. That is,
 (i)f A (here, Holiday Homes) used or understood the words in a particular sense and asserts that B (here, the owners'), without having actual knowledge, had reason to know A's usage and meaning, the only way to establish such "reason to know" is to convince the court that a "reasonable" man in B's position under exactly similar circumstances would in fact have known A's usage and meaning. A's evidence must show the common usage of other men in like circumstances.
 
 
 [3]
 A. Corbin, Contracts § 538, at 73 (1960). The "common usage" giving rise to B's (the owners') reason to know, however, must be common to both parties. See Restatement (Second) of Contracts § 220 ("relevant usage" is employed in interpreting a contract "if each party knew or had reason to know of the usage"). Here, Holiday Homes offered no evidence to establish that the owners were familiar with the common usages among real estate agents. Nor could the bare fact that the owners had retained the services of an attorney suffice to support any inference that they understood the contract as Holiday Homes did, or that they were familiar with common usages among realtors
 
 
 [9]
 For the sake of clarity, we note that our interpretation of the contract is not identical to that which the owners have urged upon us in their briefs before this court. The parties agree that the contract entitled Holiday Homes to a commission if in fact it procured a buyer "ready, willing and able to purchase" the land, so that aspect of the contract is not in dispute. The owners go on to assert, however, that under the contract Holiday Homes was entitled to a commission only if it actually procured a buyer. See Reply Brief at 11. The district court rejected this more restrictive reading of the contract; under the district court's interpretation of the contract, if a sale were made to a buyer found by another real estate agent. Holiday Homes would be entitled to a commission even though it was not the "procuring cause" of the sale. To this extent we affirm the district court's holding; our disagreement is solely with the district court's conclusion that the broker would be entitled to a commission if the owners themselves, rather than another broker, procured a buyer
 
 
 [1]
 Comment d to section 449 indicates that damages for breach of an exclusive right to sell are normally calculated as the agreed upon commission. The promise which has been breached in most cases is the promise to provide the commissions. Alternatively, the agreement may be interpreted as embodying only a promise that the principal will not accomplish the result himself. The damages to which an agent is entitled for breach of this second promise is the amount promised for performance, diminished by any expense he would have had in accomplishing the result, and he is entitled to this only if he can show that there is a probability that he would have accomplished the result
 
 
 [2]
 See, e.g., Community Cablecasting Corp. v. Daniels & Assocs., 215 So.2d 17 (Fla.Dist.Ct.App.1968); Rubin v. Beville, 132 So.2d 783 (Fla.Dist.Ct.App.1961); Nicholas v. Bursley, 119 So.2d 722 (Fla.Dist.Ct.App.1960); Bolger v. Danley Lumber Co., 77 Ill.App.3d 207, 32 Ill.Dec. 685, 395 N.E.2d 1066 (1979); Brown v. Miller, 45 Ill.App.3d 970, 4 Ill.Dec. 649, 360 N.E.2d 585 (1977); Stromberg v. Crowl, 257 Iowa 348, 132 N.W.2d 462 (1965); Foltz v. Begnoche, 222 Kan. 383, 565 P.2d 592 (1977); Bourgoin v. Fortier, 310 A.2d 618 (Me.1973); De Boer v. Geib, 255 Mich. 542, 238 N.W. 226 (1931); Peeler Ins. & Realty Inc. v. Harmon, 20 N.C.App. 39, 200 S.E.2d 443 (1973); American Property Serv., Inc. v. Barringer, 256 N.W.2d 887 (S.D.1977). See generally Annot., 88 A.L.R.2d 936 (1963). Contra, Covino v. Pfeffer, 160 Conn. 212, 276 A.2d 895 (1970)
 
 
 [3]
 Stromberg v. Crowl, 257 Iowa 348, 132 N.W.2d 462 (1965), presents a more extreme example of the unwillingness of a court to uphold an exclusive right of sale in the absence of explicit language in the agreement setting forth the nature of that agency. In Stromberg the brokerage agreement before the court included the following provisions
 In consideration of your agreement to use your efforts to find a purchaser, I hereby grant you the exclusive right for 90 days from date hereof to sell the above described property.... If said property is sold before the termination of this agreement, I agree to pay you a commission of 5 per cent on the selling price.
 Id. at 349, 132 N.W.2d at 463. Relying on earlier decisions which had held that the owner's right to sell his own property is an implied condition of every contract of agency, the court held that "the listing contract involved here ... does not by clear and unequivocal language negative plaintiff's right to sell the farm themselves without liability to defendant for a commission." Id. at 352, 132 N.W.2d at 464.
 
 
 [4]
 See, e.g., Rubin v. Beville, 132 So.2d 783 (Fla.Dist.Ct.App.1961); Bolger v. Danley Lumber Co., 77 Ill.App.3d 207, 32 Ill.Dec. 685, 395 N.E.2d 1066 (1979); Brown v. Miller, 45 Ill.App.3d 970, 4 Ill.Dec. 649, 360 N.E.2d 585 (1977); De Boer v. Geib, 255 Mich. 542, 238 N.W. 226 (1931); Peeler Ins. & Realty, Inc. v. Harmon, 20 N.C.App. 39, 200 S.E.2d 443 (1973); American Property Servs., Inc. v. Barringer, 256 N.W.2d 887 (S.D.1977)
 
 
 [5]
 The agreement provides that Holiday is to render its services "under the terms stated herein on an Exclusive Right to Sell bassis (sic)"
 
 
 [6]
 For example, the agreement before the court in Foltz v. Begnoche, supra, provided in relevant part:
 the undersigned owner hereby gives your agency the exclusive right until Feb. 16, 1975 from date hereof, to sell (the property) for the sum of $32,000 and upon the following terms: ...
 
 
 [222]
 Kan. at 384, 565 P.2d at 594. In other agreements that have been held to establish only an exclusive agency, however, the phrase has been given more prominence. See, e.g., Bourgoin v. Fortier, 310 A.2d 618, 619 (Me.1973) ("the undersigned, as owner, gives the above named agent the exclusive right of sale or exchange to said property at the price and on the terms herein stated, ...")
 
 
 [7]
 The majority conclude that "the bare fact that the owners had retained the services of an attorney" does not support an inference that they were familiar with the term's meaning as used by realtors. Majority opinion, typescript op. at p. 1185 n.8. The attorney testified that he did not understand the contract to mean that it barred the owner from selling his property. It is enough, however, that the owners should reasonably have known, through their attorney, the meaning of the phrase for them to be bound by that meaning. See 3 A. Corbin, Contracts § 538 at 73 (1960). The district court made no finding as to whether use of the phrase was common enough so that an attorney in the Virgin Islands should have been aware of its meaning