**VANGUARD TELECOMMUNICATIONS, INC.**

v.

**SOUTHERN NEW ENGLAND TELEPHONE COMPANY, CSX Corporation and Lightnet, a joint venture.**

Civ. A. No. 87-2321.

United States District Court,
D. New Jersey.

May 31, 1989.

---

Gerald T. Ford, Siff, Rosen & Parker, P.C., Newark, N.J., and John G. Jacobs, Plotkin & Jacobs, Ltd., Chicago, Ill., for plaintiff.

Matthew P. Boylan, Lowenstein, Sandler, Kohn, Fisher & Boylan, Roseland, N.J., and Jack Lipson, Arnold & Porter, Washington, D.C., for defendants.

LECHNER, District Judge.

Vanguard Telecommunications, Inc. ("Vanguard") is incorporated, headquartered and has its principal place of business in the State of New Jersey. It is in the business of providing telecommunication consulting and related services and at times relevant to this matter was in the business of brokering long distance telephone capacity. Vanguard brought this ac-

tion against Southern New England Telephone Company ("SNET"), CSX Corporation ("CSX") and Lightnet for breach of contract. (Defendants will be referred to collectively as "Lightnet.") Vanguard contends it entered into an oral agreement with Lightnet and that agreement entitles it to commissions on sales of Lightnet capacity "without regard to the extent to which Vanguard's efforts were accountable for the sale of any account." Complaint at ¶ 10. Specifically, Vanguard claims it was retained to assist in the marketing of Lightnet services and is entitled to a commission of two percent for the sale of Lightnet services to United Telecommunications ("United") and lease agreement with Americall LDC, Inc. ("Americall").[1]

SNET is incorprated, headquartered and has its principal place of business in the State of Connecticut. SNET is a diversified telecommunications services company. CSX is incorporated, headquartered and has its principal place of business in the State of Virginia. CSX owns and operates a number of railroad companies with extensive tracks and rights-of-way in various parts of the United States. SNET and CSX formed the Lightnet joint venture to market inter-city fiber optic long distance telecommunications capacity in a system designed to connect numerous Mid–Western and Eastern cities. Lightnet's headquarters is currently in Rockville, Maryland. Subject matter jurisdiction over this action is conferred by 28 U.S.C. § 1332(a)(1).

Vanguard moves to file a second amendment to the Complaint to include a fraud count against Lightnet. Specifically, the proposed amendment would add an additional count comprised of two paragraphs. The first proposed additional paragraph incorporates by reference earlier provisions of the Complaint. The second proposed additional paragraph states:

> At the time of entering into the said Agreement, it was defendants' intention not to honor the said Agreement; defendants intended plaintiff to rely upon their conduct in entering into the Agreement, which plaintiff did to its injury. Defendants' conduct as set forth above, as well as in other regards, was fraudulent, and was part of and constituted a scheme to defraud plaintiff.

Proposed Second Amendment to the Complaint ¶ 25.

 Lightnet moves for summary judgment pursuant to Federal Rule of Civil Procedure 56 to dismiss the Complaint and Vanguard's proposed second amendment to the Complaint. Lightnet presents four arguments in support of its motion: (1) the agreement between the parties provided that Vanguard would receive a commission only if Vanguard was the effective or producing cause of a sale; (2) Vanguard did not cause the sale and lease of Lightnet capacity to United and Americall; (3) Vanguard is not entitled to punitive damages for either the economic loss sustained due to the alleged breach of contract or for the allegations of fraud in Vanguard's proposed amendment to the Complaint; and (4) the asserted claim of fraud does not set forth a viable claim under the law of the State of New Jersey and, even if it does, summary judgment is appropriate because of a lack of evidence to support it.[2]

---

1. The sale to United was in excess of $115,000,-000 and the lease to Americall was in excess of $1,000,000. Defendants' Third Supplemental Response to Interrogatories No. 13 and Plaintiff's Third Set of Interrogatories No. 14.

2. In support of its motion for summary judgment, Lightnet has submitted a Memorandum of Law ("Moving Brief"); Reply Memorandum of Law ("Reply Brief"); Statement of Material Facts Not in Genuine Dispute Pursuant to Local Rule 12(G) ("Defendants' 12(G) Statement"); Main Appendix to Memorandum in Support of Defendants' Motion for Summary Judgment, Volumes I and II ("Defendants' Appendix")

which includes excerpts from various affidavits, interrogatories and depositions and excerpts from the March 14, 1988 proceedings before Magistrate Ronald J. Hedges; and a Supplemental Appendix to Defendants' Reply Memorandum ("Defendants' Supp. Appendix") which includes excerpts from various depositions.

In opposition to Lightnet's motion, Vanguard has submitted a Memorandum of Law ("Opposition Brief"); Statement of Material Facts Not in Genuine Dispute Pursuant to Local Rule 12(G) ("Plaintiff's 12(G) Statement"); and an Appendix to Plaintiff's Memorandum ("Plaintiff's Appendix") which includes excerpts from various

For the reasons which follow, Vanguard's motion to amend is denied; Lightnet's motion for summary judgment is granted in all respects.

*Factual Background*

The concept of Lightnet as a partnership was conceived by Robert E. LaBlanc Associates ("LaBlanc") in 1982 when that firm was retained by CSX as a consultant. Robert LaBlanc, the president of the firm, is an expert in the telecommunications field. LaBlanc recommended that CSX use its railroad rights-of-way to build a fiber optic network by forming a joint venture with a major telecommunications carrier. As LaBlanc saw it, the joint venture would install a high capacity fiber optic transmission system along CSX's rights-of-way and sell that capacity to interested parties. After advising CSX of its concept, LaBlanc submitted a business plan to implement its ideas. CSX then asked LaBlanc to locate a partner with whom CSX could collaborate. United and SNET were among the several partnership candidates LaBlanc considered.

Lightnet currently operates a communications network consisting of approximately 5,000 miles of fiber optic cable,[3] much of which has been laid alongside CSX owned railroad rights-of-way in the eastern part of the United States. Lightnet originally planned to sell its capacity to customers who would themselves operate over the network. These customers would include common carriers, such as GTE or United, large corporations with internal telecommunications needs, and government agencies. In 1983 and 1984, the relevant period for purposes of this motion, Lightnet's principal objectives were to build the network and sell capacity.

On April 19, 1983, CSX and SNET publicly announced their intention to study the market potential of a fiber optic telecommunications system using the CSX rights-of-way. The announcement was carried in the press. Four months later, at a press conference on August 23, 1983, the formation of Lightnet as a going entity was made public.

Vanguard appears to be the corporate entity under which its president and sole shareholder, Donald Van Doren, does business. The business of Vanguard is "brokering long distance telephone capacity." Complaint ¶ 1. It appears that from the beginning of events relevant to this matter, Vanguard has held itself out to Lightnet as a broker.

From the submissions, it appears Vanguard became aware of the CSX/SNET joint venture through the August 23, 1983

---

affidavits, interrogatories, depositions and documents.

Testimony and affidavits are cited "[witness] Dep. at [page]" and "[witness] Aff. [paragraph]." Exhibits are designated "Ex. ___" and the appendix they are located in is provided. Citations to deposition testimony and affidavits are provided only where a direct quotation or paraphrase is utilized. Citations are made to the Complaint and the parties' briefs where relevant, although these documents are not sufficient to raise genuine issues of material fact.

As part of its appendix, Vanguard has submitted the affidavits of James C. Rice and Donald H. Van Doren. Lightnet objects to the admissibility of these affidavits on a number of evidentiary and substantive grounds. *See* Defendants' Supp.App. "Obj. to Affs." Both Rice and Van Doren were subject to lengthy depositions during discovery. Lightnet argues Vanguard has submitted these affidavits in an attempt to give Rice and Van Doren the opportunity to vary or change their deposition testimony. Much of the Van Doren and Rice affidavits is cumulative to their deposition testimony. At certain portions of the Van Doren Affidavit, the affiant does attempt "to clarify" statements given during his deposition. *See* Van Doren Aff. ¶¶ 13–19.

It is important to note there are situations in which sworn testimony can properly be corrected by a subsequent affidavit. Where the witness was confused at the earlier deposition or for some other reason misspoke, a subsequent correcting or clarifying affidavit may be sufficient to create a material dispute of fact. This rule does not apply here, however, where Van Doren was carefully questioned and had access to the relevant information. *Martin v. Merrell Dow Pharmaceuticals, Inc.,* 851 F.2d 703 (3d Cir.1988); *Carney v. Dexter Shoe Co.,* 701 F.Supp. 1093, 1103 (D.N.J.1988). Accordingly, any statements in the affidavits of Van Doren and Rice which contradict earlier deposition testimony will be disregarded for purposes of deciding this motion.

3. Fiber optic systems rely on the rapid transmission of light pulses through hair-thin strands of glass fibers. These light pulses consist of infrared wave lengths which are generated by lasers.

press conference announcing the formation of Lightnet. From the newspaper accounts of the joint venture, Vanguard considered Lightnet to be a "target of opportunity."

It further appears Vanguard did not have experience in selling telecommunications capacity. Nevertheless, it sought out and solicited Lightnet, offering to broker Lightnet's capacity to "resellers," firms which purchase capacity in bulk and resell it in smaller quantities. Vanguard claimed it had an understanding of resellers. Vanguard was directed to La Blanc which was then acting as a marketing representative for Lightnet.

In September, 1983, negotiations were initiated between Vanguard and La Blanc. Vanguard was represented by Van Doren, and its Vice–President James Rice ("Rice").[4] La Blanc was represented by its Vice–President, Richard Wolf ("Wolf"). Vanguard again expressed interest in acting as broker for Lightnet capacity. Vanguard was later retained by Lightnet to assist in the marketing of Lightnet's services, principally in the carriers' market. The terms of this contractual relationship form the subject matter of the instant lawsuit.

*The October 20, 1983 Meeting*

Following the negotiations between Vanguard and La Blanc, Vanguard was notified by letter on October 19, 1983 by Robert La Blanc that Lightnet had rejected the proposal from Vanguard that it be retained to sell Lightnet capacity pursuant to Vanguard's terms. Vanguard was informed that Lightnet would sell capacity to Vanguard on a non-exclusive basis which could be resold by Vanguard. It is Vanguard's contention that on October 20, 1983 it reached an oral agreement with Wolf "to assist in the marketing of Lightnet's services...." Complaint ¶ 6. Vanguard contends an October 20, 1983 letter of introduction indicates Vanguard "has been retained as a representative by Lightnet to act in their behalf in marketing Lightnet." *Id.* at ¶ 6 (citing Exhibit A to Complaint,

October 20, 1983 letter from Wolf). With regard to the oral agreement of October 20, Vanguard stated in answers to interrogatories:

> On that date [October 20, 1983], it was agreed that Vanguard would be paid a minimum commission of 2% on any sales that *Vanguard brought to Lightnet.*

Plaintiff's Appendix at 37 (Plaintiff's Response to Interrogatory No. 1 of Defendants' First Set of Interrogatories (emphasis added)).

The October 20, 1983 meeting was held by Wolf, Rice and Carroll Bowen ("Bowen"), partner in Carroll Bowen Associates, a telecommunications firm that colloborated with Vanguard. During the meeting, the representatives of Vanguard and Lightnet discussed Lightnet's potential market and Vanguard's proposed marketing strategies. Vanguard began drafting an agreement in principle to memorialize the understanding it contends was achieved with Wolf. The common thread running through the Vanguard drafts was that Vanguard would be compensated for sales of Lightnet capacity which it made. A written agreement was subject to Lightnet's approval.

The two percent commission arrangement is at the crux of the current dispute between the parties. Vanguard claims it negotiated for a commission provision with no causation requirement. That is, Vanguard would be entitled to two percent of all sales made to customers on an account list regardless of whether its marketing efforts produced those sales. Vanguard contends that if a potential customer was placed on the account list and that customer then purchased Lightnet capacity, Vanguard would be paid its commission without deciding whether Vanguard or someone else had actually "caused" the sale.

Lightnet vigorously denies this was the agreement made by the parties. Lightnet maintains the parties reached a mutual understanding that Vanguard would be

---

4. Although Rice is not a party and has had no ownership interest in Vanguard, he entered into a sharing agreement with Vanguard one year after this dispute arose. Under the terms of that agreement he is to receive from ten percent to fifty percent of any recovery in this case. Rice Dep. Ex. 26; Moving Brief at 6–7.

compensated for business it specifically generated. Lightnet claims any arrangement of the sort suggested by Vanguard would be contrary to Lightnet's economic interests as well as the legal presumption that an agent must earn a commission. Because the October meeting produced no written agreement, the actual terms of Vanguard's commission arrangement were left ambiguous.

Vanguard claims that based on its discussions with Wolf during the October 20 meeting, Rice and Vanguard devoted significant time to marketing Lightnet. During the period between October 20 and December 29, 1983, Vanguard contends it actively engaged in the marketing of Lightnet, including "packaging the product," "competitive analysis" and "pricing."[5] Opposition Brief at 17–20.

While Rice and Van Doren were pursuing these projects, the parties worked toward finalizing a written agreement. A series of drafts of the arrangement was prepared. A first draft was prepared by Rice some time after the October meeting. Rice noted on the face of this document that the draft "reflects results of conversations with [Wolf]." Van Doren Dep. Ex. 11 at 302451. The draft stated:

> Vanguard will receive a commission of not less than 2% of any *sales that are created by Vanguard's efforts.*

*Id.* at 302452 (emphasis added). Another draft agreement which Vanguard also prepared for Wolf was described by Rice as "true to our verbal agreement on most points." Van Doren Dep. Ex. 9, Ltr. from Rice to Wolf, dated November 8, 1983 at 1. This draft refers to Vanguard's obligation to "market full or partial LIGHTNET fiber pairs," and to Lightnet's obligation to "exercise its best efforts in obtaining financing for the purchase or lease of LIGHTNET facilities by *Vanguard obtained customers.*" Van Doren Dep. Ex. 9, Agreement in Principle ¶¶ 1 and 4 (emphasis added). The draft stated the commission ar-

rangement and pricing system were designed "to provide LIGHTNET the opportunity of *receiving orders immediately from Vanguard* ...." *Id.* at ¶ 5.4 (emphasis added).

On November 15, 1983, Rice sent to Wolf another version of the Agreement in Principle.[6] This document provided:

> 4. LIGHTNET will provide Vanguard, at no cost, sales literature and collateral material in reasonable quantities made available to LIGHTNET or other marketing representatives of LIGHTNET services and facilities. Technical support will also be provided at no cost and may include visits by Western Electric or LIGHTNET personnel to locations where potential customers need solutions to interconnection problems, technical questions answered or *to assist Vanguard close a sale.*
>
> 5. LIGHTNET may assist in obtaining financing for the purchase or lease of LIGHTNET facilities by *Vanguard obtained customers.* LIGHTNET will extend credit terms to *Vanguard's prospective customers* on the same basis as other prospective customers with similar qualifications.

Plaintiff's Appendix at 46, ¶¶ 4 and 5 (emphasis added).

Vanguard contends this draft constituted a "final" version of the parties' agreement. A final written agreement in principle was never reached. None of the draft agreements were signed by either party. As for the intended duration of the Vanguard–Lightnet arrangement, the November 8, 1983 draft indicated it may be superceded by a "different and/or more definitive agreement." The November 15, 1983 draft contained a similar clause reading: "This Agreement in principle will remain in effect until July 1, 1984, and will be renewed automatically unless notification is given by either party sixty days prior to the scheduled termination date." Plaintiff's Appendix at 47.

---

**5.** It is noted Lightnet paid Vanguard over $47,000 for the time and expense expended by Vanguard on Lightnet's behalf. Van Doren Dep. at 463–64, 492–94.

**6.** While the November 8, 1983 and November 15, 1983 drafts were designated "Agreement in Principle," the initial draft contained no title.

*December 29, 1983 Meeting*

On December 29, 1983, Van Doren met in New Haven, Connecticut with Frank Wollensack ("Wollensack"), president of Lightnet, Dennis Evans ("Evans"), division manager of marketing and sales at Lightnet, and Gerald Clement ("Clement"), marketing manager of Lightnet. Among the issues discussed was how Vanguard would be compensated under the Draft Agreement in Principle. Vanguard claims that during this meeting Van Doren reiterated the importance of Vanguard's account list concept, i.e., the notion that if a sale occurred to a customer on Vanguard's account list Vanguard would get paid without getting into judgments as to whether Vanguard had *caused* the sale or was *responsible* for it.

Lightnet disputes this characterization of what transpired and points to the deposition of Van Doren. Van Doren testified he was not able to recall whether a discussion of the "cause/commission" issue took place at the December 29 meeting.

Q. Is it your testimony, Mr. Van Doren, that at the meeting of December 29th you specifically addressed the question whether there should be an agreement that in part would provide a commission for Vanguard in the event a customer on some list bought Lightnet capacity even though Vanguard had not been responsible for the actual sale?

[Colloquy of counsel omitted.]

A. I don't recall whether that particular example or discussion came up.

Van Doren Dep. at 371–372. However, later in the deposition, Van Doren restated Rice and Bowen's concerns with the potential confusion of a "beauty contest" approach.

A. [W]e didn't want to get into a position where we would be assigning that responsibility or trying to decide whether or not a sale belonged because of Lightnet's efforts or because of Vanguard's efforts or whatever.

Q. And all this was discussed on the 29th.

A. To the best of my recollection, yes. All of this was discussed. Now, I'm sorry. I would just like to say one other thing.

You had asked a question, you know, Did anyone say you mean that Vanguard could get a commission if they did nothing, or words to that effect? I don't know if that came up or not. It's not inconceivable based on the kinds of discussions that we were having about this issue. *Again, it certainly wouldn't be our intent for that to happen.*

*Id.* at 373 (emphasis added).

Clement disputes Van Doren's account of what took place during this meeting:

Q. On December 29, 1983, was there any discussion with Van Doren about the difficulty in assigning the "credit" for a sale? In other words, who had really caused the sale.

A. I believe that there were some discussions on that.

Q. Wasn't there a discussion concerning the fact that in any sales process, there would have to be involvement not just by Vanguard but by people from LightNet and, perhaps, SNET, and, perhaps, Western Electric?

A. Yes.

Q. Wasn't there a discussion on December 29, 1983 of the fact that, in Van Doren's view, at least, the only system that would make sense, given that reality as to how the sales process would have to come about, was to have a list and say, if anybody on that list buys within a specified period of time, Vanguard gets a commission, without trying to make a determination as to who caused the sale or whether Vanguard had earned that commission on that sale?

\* \* \* \* \* \*

THE WITNESS: The answer would be yes, from Van Doren. You are saying, that came from Don Van Doren?

MR. JACOBS [Counsel for Vanguard]: Right.

THE WITNESS: The answer would be yes.

BY MR. JACOBS:

Q. What was the response to Van Doren at the December 29, 1983 meeting?

A. The response at that meeting would be that that would be totally unacceptable to LightNet.

Q. Somebody told Don Van Doren that would be totally unacceptable to LightNet?

A. I believe they did.

Clement Dep. II at 42–43.

*January 19, 1984 Meeting*

Both parties agree that the purpose of the January 19, 1984 meeting was to reach a final agreement as to the terms under which Vanguard would sell Lightnet capacity. Attending the meeting were Van Doren, Evans and Clement. The Complaint alleges that during this meeting the parties agreed to delete certain accounts from the account list from which Vanguard had been working. Vanguard contends it was to limit its efforts to those requested by Lightnet, not to act on its own initiative with respect to any of the specified accounts and was to receive a two percent commission on all sales made to customers on the account list until February 1, 1986. Complaint ¶ 10. Vanguard also claims during this final meeting the parties agreed the commission "was to be paid without regard to the extent to which Vanguard's efforts were accountable for the sale to any account—under the terms of the Agreement, if a sale were made to any of the specified accounts during the specified time period, Vanguard was to receive the aforesaid commission." *Id.* at ¶ 10.[7]

Lightnet's representatives, Evans and Clement, provide a different account of what transpired. Both testified that Evans told Van Doren that Vanguard would be paid a commission only if it produced a sale. Evans Dep. at 256 ("Q. Tell us what you said to Mr. Van Doren about commissions that would be paid to Vanguard. A. If Vanguard made a sale, they would be entitled to a two percent commission for the sale."); Clement Dep. at II–112 ("A. Dennis explained to Don that in order for Vanguard to be eligible for a commission on a sale, Vanguard had to cause the sale to happen.")

Vanguard's rebuttal to these statements is summarized in Van Doren's deposition testimony:

A. ... There were lots of ways that Lightnet people would have to be directly involved in the sale to customers on that list, and that—and that it would be foolish—I don't remember if I used that word, but it would be certainly a bad business decision to constrain or put barriers or boundaries on the way an agreement was drawn up such that, for example, Vanguard felt that we better not call in Lightnet here because we might lose, quote, credit, closed quote, for the sale. That was just a dumb idea because we might do something that was counterproductive to what our objective was; that is, well Lightnet capacity, so the point is we didn't want to try and fix responsibility for the sale; that is, Was it your meeting, Frank, when you came in that caused the sale to be occurred or was it our work earlier that would be involved in contacting the customer and meeting with, say, their engineers and going over the route layouts? Who know [sic]?

Van Doren Dep. at 372–373.

However, Van Doren also testified he did not recall either of the Lightnet representatives telling him that Vanguard would receive a commission regardless of its efforts. Van Doren also testified that it did not occur to him that Vanguard would be paid a commission without contributing to the effectuation of the sale. Van Doren Dep. at 433–34, 437–38, 786–87.

On January 27, 1984, Evans sent a letter to Van Doren about the January 19, 1984 discussions. Complaint Ex. C. The Complaint claims this letter reflected the "es-

---

7. Vanguard provides no explanation or justification as to why Lightnet would agree to a contract entitling Vanguard (which was then "involved" with Lightnet for only a few months) to commissions for sales it did not generate. However, Van Doren explained Vanguard's rationale for this arrangement (to avoid a "beauty contest"), Van Doren Dep. at 373; and Bowen testified this type of contract was frequently used. Bowen Dep. at 149.

sential terms" of the agreement reached between the parties. Complaint ¶ 11. The letter reads in relevant part:

In addition, Vanguard Telecommunications, Inc. will be compensated with a 2% commission on the amount of the sale price for LIGHTNET fibers or bandwidth sold to any customer on their "Account List" (attached), provided the sale is contracted for within twenty-four months beginning February 1, 1984.

We also agreed that LIGHTNET takes over sales responsibility for all accounts on the Account List. *This means Vanguard will not represent LIGHTNET from now on, except as mutually agreed upon in advance for customers on the Account List.* For example, we'll mutually agree on your role/our role with ALLNET following our planned joint meeting with the customer. The other accounts will be reviewed with you and we'll decide where a dual customer visit is appropriate, where Vanguard should telephone the customer to explain the change in account handling, or where we should work with you on the sale for some time.

Complaint Ex. C (emphasis added).

The parties characterize the import of this letter very differently. Lightnet maintains that the letter makes no reference to an agreement that commissions would be paid to Vanguard where it was not responsible for the sale. Inverting Lightnet's argument, Vanguard asserts that the letter contains no provision which required Vanguard to "cause" a sale in order to receive a commission.

### The Account List

The account list concept and the terms of Vanguard's compensation are described in different ways in the various submissions by both parties. Discussing the method of compensation orally agreed to by Lightnet and Vanguard, Bowen referred to the arrangement as an "override or percentage based commission ... you know, a more consultant based arrangement." Bowen Dep. at 122–123. When asked how the commission structure was intended to operate, Bowen explained:

Q. [A]t this meeting did Mr. Wolf say that Vanguard would earn a commission even if Vanguard had nothing to do with the sale of fiber optic capacity of Lightnet's?

[Colloquy of counsel omitted.]

A. I believe that I recall that I answered that we considered different modes of or different structures for compensation and because of the urgency of the undertaking and because it was the best vehicle for getting going with the marketing effort in the short-term we opted among the options for the commission override arrangement and it was to have been an override for all sales, regardless of how they were finally executed to an approved customer list or client list if you prefer.

*Id.* at 131–132. He continued:

Q. So it was your understanding that Vanguard could do nothing at all about trying to sell customer X but that if customer X wound up purchasing Lightnet capacity Vanguard would be entitled to a commission on that sale?

A. Yes.

*Id.* at 134. Bowen stated that:

We had a very good meeting of the minds and Wolf felt no constraint in giving us a document to go off with like that, brief though it be, but it spurred and instantly produced a tremendous flurry of marketing effort ...

*Id.* at 133–134, and explained there was nothing unusual about such an arrangement:

A. Not if it was on your turf, so to speak. You divide up the sales prospect world into universes. And this is assigned to sales agent A and this is assigned to sales agent B or C. It happens all the time. And you don't have to execute a specific sale in order to earn a commissionable sale.

*Id.* at 149.

In contrast to these comments, in its sworn interrogatory answer, Vanguard stated as follows:

On [October 20, 1983], it was agreed that Vanguard would be paid a minimum com-

mission of 2% *on any sales that Vanguard brought to LIGHTNET.*

Plaintiff's Appendix at 37 (Plaintiff's Response to Interrogatory No. 1 of Defendant's First Set of Interrogatories) (emphasis added).

Lightnet contends Rice's deposition testimony supports this very different version of the parties' understanding as of October, 1983. During his deposition, Rice reviewed the initial discussions between Vanguard and Lightnet where the nature of Vanguard's role was addressed. He testified that Vanguard spoke with Wollensack "about us acting as brokers and the concept of selling Lightnet capacity for them...." Rice Dep. at 147. Addressing the commission-fee structure worked out between the parties, Rice explained:

> We were going to get a minimum of two percent. *If we could sell capacity* or do a large deal or whatever it was and we were able to ... get that deal at a 10 percent discount, then that five percent margin would be ours.

Rice Dep. at 174–175 (emphasis added).

■ As this discussion of the facts illustrates, the parties are hopelessly deadlocked regarding their understanding of the method by which Vanguard would be compensated. It is unclear whether a final agreement was ever reached. There is no written and signed document unambiguously setting forth their respective rights and obligations. This is not to say, however, the dispute between the parties is not ripe for summary judgment. As the following discussion will illustrate, in order for this controversy to proceed to the trial stage, the Vanguard–Lightnet deadlock must rest upon a genuine issue of material fact—something which is not present in this matter.

### Discussion [8]

Lightnet raises four arguments in support of its motion for summary judgment.

First, Lightnet contends the agreement it reached with Vanguard did not entitle Vanguard to commissions for sales procured through the efforts of Lightnet. Second, because the sale and lease of Lightnet capacity to United and Americall were the result solely of Lightnet's efforts, Vanguard is not entitled to a commission. Third, Lightnet alleges Vanguard is not entitled to punitive damages for either the economic loss sustained by the alleged breach of contract or for the allegations of fraud in Vanguard's proposed amendment to the Complaint. Finally, Lightnet argues Vanguard's claim of fraud has no legal or factual basis.

### Summary Judgment Standard

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The district court's task is to determine whether disputed issues of fact exist, but the court cannot resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *See Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a fact issue,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.' ... Where the record taken as a whole could not lead a rational

---

**8.** A federal court exercising diversity jurisdiction is bound to follow the substantive law of the forum state as expressed by the highest court of that state. *Klaxon Co. v. Stentnor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct.

1020, 85 L.Ed. 1477 (1941); *Cooper Laboratories v. International Surplus Lines*, 802 F.2d 667, 672 (3d Cir.1986). The parties do not contend otherwise. Accordingly, New Jersey law will be applied to Lightnet's substantive arguments.

trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

*Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1356 (emphasis in original, citations and footnotes omitted).

The Court elaborated on the standard in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted): "If the evidence [submitted by a party opposing summary judgment] is merely colorable ... or is not significantly probative ... summary judgment may be granted." The Supreme Court went on to note in *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986) (footnote omitted): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." Thus, once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing a need for trial. *See* Fed.R.Civ.P. 56(e).

### Statute of Frauds

While Vanguard and Lightnet devote considerable effort to undermining each other's interpretation of the oral agreement between them, neither party addresses the threshold issue of whether the alleged oral contract is enforceable under the New Jersey Statute of Frauds. N.J.S.A. 25:1–5.[9] The Statute of Frauds prohibits the enforcement of certain promises unless they are in writing. "Moreover, even in cases not controlled by the Statute of Frauds, the courts of New Jersey have enforced oral contracts only when there is clear and convincing evidence of the specific promise made and that promise encompassed all of the terms necessary to its enforcement."

*Kreuzburg v. Computer Sciences Corp.,* 661 F.Supp. 877, 877 (D.N.J.1987) (citing *Woolley v. Hoffmann–LaRoche, Inc.,* 99 N.J. 284, 293, 491 A.2d 1257, *modified,* 101 N.J. 10, 499 A.2d 515 (1985)).

In *Kreuzburg,* plaintiff brought an action against his employer alleging unpaid commissions. The defendant conceded it had made a verbal representation that plaintiff would be entitled to incentive payments of three percent of the revenues received for a certain sales account over a three year period. Retreating from his initial admission of the three year provision, plaintiff argued that his agreement with defendant was alotted no specific time frame and thus could have been performed in less than one year. 661 F.Supp. at 879. The district court rejected the plaintiff's strategic change of argument and granted summary judgment for the defendant, finding the agreement was within the Statute of Frauds. The court noted that even if it conceded the contractual period was indeterminate, New Jersey law would bar enforcement of the contract because "the terms of this alleged promise cannot be reasonably ascertained." *Id.*

It is unclear what time period the Vanguard–Lightnet oral contract was intended to cover. Neither Vanguard nor Lightnet offers evidence suggesting that this issue was raised during their negotiations. The initial draft makes no reference to a time period. Van Doren Dep. Ex. 11. The November 8, 1983 Agreement in Principle states: "This Agreement in Principle will remain in effect until July 1, 1984 and will be renewable in six month intervals upon mutual consent." Van Doren Dep. Ex. 9. The November 15, 1983 draft states the Agreement "will remain in effect until July 1, 1984, and will be renewed automatically unless notification is given by either party

---

9. This provision reads in relevant part:

 **25:1–5. Promises or agreements not binding unless in writing**

 No action shall be brought upon any of the following agreements or promises, unless the agreement or promise, upon which such action shall be brought or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or by some other person thereunto by him lawfully authorized:

 \* \* \* \* \* \*

 (e) An agreement that is not to be performed within one year from the making thereof.

sixty days prior to the scheduled termination date." Plaintiff's Appendix at 47.

■ However, the January 27, 1984 letter concerning the January 19, 1984 and earlier discussions suggests the intended length of the contract was to be two years. ("Vanguard ... will be compensated with a two 2% commission ... provided the sale is contracted for within twenty-four months beginning February 1, 1984." Complaint Ex. C). It is noted that these documents do not serve as a written memorialization of the commission agreement because they are not signed by the party to be charged, Lightnet, and thereby do not comply with the Statute of Frauds. N.J.S.A. 25:1–9; *Smith v. Cyprus Industrial Minerals Co.*, 178 N.J.Super. 7, 11, 427 A.2d 1114 (App. Div.1981).

■ Because there is no clear expression by the parties of the time period covered by their agreement, it is likely the contract was intended to remain effective for an indeterminate period of time. In such a case, the Statute of Frauds does not bar its enforcement. The Supreme Court of New Jersey has held N.J.S.A. 25:1–5 "is inapplicable to an oral agreement bearing no fixed term and possibly performable within the year even though complete performance within that term may be unlikely." *Loeb v. Peter F. Pasbjerg & Co.*, 22 N.J. 95, 99, 123 A.2d 522 (1956); *Kreuzburg*, 661 F.Supp. at 879. While the policy considerations motivating the Statute of Frauds and the preference of New Jersey courts to view ambiguous oral contracts with caution suggest that oral contracts are disfavored, the Vanguard–Lightnet agreement will not be deemed barred by the Statute of Frauds for purposes of this motion. *See Kreuzburg*, 661 F.Supp. at 877; *Woolley*, 99 N.J. at 293, 491 A.2d 1257.

*Exclusive Right of Sale*

■ As the discussion of the factual background indicates, the terms of the commission arrangement between Vanguard and Lightnet are strongly contested. While the determination of whether a contract is ambiguous is a question of law, the intended meaning of a contract is ordinarily considered a question of fact reserved for the jury. *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 362 (3d Cir.1987); *Borbely v. Nationwide Mut. Ins. Co.*, 547 F.Supp. 959, 966 (D.N.J.1981). When ruling on a summary judgment motion in a case involving the intended meaning of a disputed contractual provision, "the court is being asked to rule on whether, as a matter of law, the contract is susceptible of only one interpretation." *Tigg*, 822 F.2d at 363. If there is any evidence in the record, from any source, from which a reasonable inference can be drawn in the nonmovant's favor, a motion for summary judgment cannot be granted with regard to the meaning of a contract. *Id.*

Given the opposing interpretations of the Vanguard–Lightnet agreement and the absence of any dispositive written record of this agreement, the parameters of Vanguard's rights to a commission are ambiguous. However, Lightnet suggests that this factual dispute is of no consequence. For, as a matter of law, the evidence adduced by either or both parties cannot support Vanguard's contention that it is entitled to a commission for sales which it did not produce by its efforts. Accordingly, there is no need for a jury to determine the meaning of the contract; the contract is ambiguous, at least that portion concerning the right of Vanguard to a commission.

Lightnet cites to the Third Circuit case *Holiday Homes of St. John, Inc. v. Lockhart*, 678 F.2d 1176, 1185 (3d Cir.1982), for the proposition that "an owner should not be deemed to have relinquished the right to sell his own property through his own efforts except by clear and unequivocal language in the contract." Lightnet argues that because Vanguard's commission agreement lacked such a clear and unequivocal provision, Vanguard is legally not entitled to a commission for sales it did not cause.

*Holiday Homes* involved an action by a real estate agency which sought payment of a commission in connection with a sale of property. The owners of the property claimed they arranged a sale on their own without the agency's assistance. Although

the broker's written contract gave the agency an "exclusive right to sell," the court found the terms of the contract ambiguous. Noting another clause in the contract which stated: "In the event the REALTOR named procures a prospect ..., the commission shall be deemed to have been earned ...," the court held the contract did not address whether the parties intended the broker to be entitled to a commission which it did not specifically earn. *Id.* at 1178.

The court found no evidence to support the conclusion that the parties intended the broker to be given an exclusive right to sell which right included the owner's right of alienation. *Id.* at 1185. Although the interpretation of the terms of a contract is generally a question of fact for the district court, there was no need to remand the case in *Holiday Homes* for findings of fact on this issue. The court supported this conclusion on two principles of contract law: (1) an ambiguous document must be construed against its author; and (2) an owner should not be deemed to have relinquished the right to sell his own property except by clear and unequivocal language in the contract. *Id.* at 1186.

■ Neither the purported memorializations nor the Vanguard contentions concerning the Vanguard–Lightnet contract contain clear and unequivocal language concerning Vanguard's asserted rights. In point of fact, neither the purported memorializations (not signed by Lightnet) nor the Vanguard contentions even approach the specificity of the *Holiday Homes* contract which was found to be insufficient. As Vanguard is the proponent of the agreement between the parties, ambiguities are resolved in Lightnet's favor. *Holiday Homes*, 678 F.2d at 1186 (quoting *Foltz v. Begnoche*, 222 Kan. 383, 565 P.2d 592, 597 (1977) ("Doubtful and uncertain language

in a contract is construed against the party preparing the contract, for he has created the troublesome ambiguity.")[10] Vanguard has offered only ambiguous statements as to whether it must be the effective cause of a sale to earn a commission. Neither the testimony of Van Doren and Rice nor the drafts of the Agreement in Principle prepared by Vanguard contain "clear and unequivocal" language authorizing Vanguard to receive a commission for sales consummated by Lightnet. Indeed, Vanguard's answers to Lightnet's interrogatories contradict its contentions concerning the commission arrangement.

■ Vanguard's efforts to distinguish the crucial holding of *Holiday Homes* are unsuccessful. As Judge Rosenn clearly stated in his concurrence in *Holiday Homes:*

In an overwhelming majority of cases involving the nature of the agency created under a brokerage agreement between an owner and a real estate agent, *courts have required the agreement to expressly and unambiguously provide that the owner has agreed to pay his agent's commission even if the owner himself sells the property* before they have recognized the creation of an exclusive right of sale.

*Holiday Homes*, 678 F.2d at 1188 (J. Rosenn, concurring) (emphasis added). This rule is equally appropriate for brokerage agreements to arrange the sale of a commodity or business interest. There is nothing intrinsic to the sale of real estate which suggests that the "clear and equivocal" rule must be limited to the facts of *Holiday Homes.*

■ The holding in *Holiday Homes* is supported by the principles of agency law. As a general rule, when an agent seeks compensation for a given outcome, the agent must be the "effective or procuring

---

10. This principle is applicable to the oral contentions of Vanguard as well as to its purported memorialization of the agreement. Because it is asserting the oral contract and its right to an unearned commission, the terms it urges are construed against it for the legal determination as to whether the purported agreement is ambiguous. Because the intent of written or oral

terms is not a consideration for this motion, inferences need not be drawn in favor of Vanguard. Nevertheless, even drawing all inferences in favor of Vanguard, it still remains that the asserted agreement is ambiguous concerning Lightnet's relinquishment of its right of alienation.

cause" of that outcome. *See* Restatement (Second) of Agency § 448. The test for determining whether a broker has earned a commission under New Jersey law was set forth in *Inventive Music Ltd. v. Cohen,* 617 F.2d 29, 32 (3d Cir.1980).

> Ordinarily, for a broker to earn a commission ... he must establish that he was the "efficient producing cause" in bringing about the sale—at least in the sense of causing the seller to negotiate with a customer, produced by the broker, who is ready, able and willing to perform, and where the transaction is later consummated without a substantial break in the ensuing negotiations. (quoting *De Benedictis v. Gerechoff,* 134 N.J. Super. 238, 339 A.2d 225, 229 (App.Div. 1975)).

*See also Floyd v. Morristown European Motors, Inc.,* 138 N.J.Super. 588, 593, 351 A.2d 791 (App.Div.1976); *Ellsworth Dobbs, Inc. v. Johnson,* 50 N.J. 528, 551, 236 A.2d 843 (1967). This rule is applied in other jurisdictions as well. *Ehrman v. Cook Elec. Co.,* 630 F.2d 529, 530 (7th Cir.1980); *Christo v. Ramada Inns, Inc.,* 609 F.2d 1058, 1061 (3d Cir.1979) (applying Pennsylvania law); *Pivar v. Moseley,* 476 F.2d 113, 115 (3d Cir.1973) (applying law of Virgin Islands).

■ No where in the argument and documentary exhibits presented by Vanguard is there evidence of "clear and unequivocal" language authorizing Vanguard to receive a commission for sales made by Lightnet or another party. In fact, there is significant evidence that the parties intended Vanguard's commission to be contingent on its "causing" a sale. *See* Van Doren Dep. Ex. 11 at 302452; Plaintiff's Appendix at 37 (Plaintiff's Response to Interrogatory No. 1 of Defendants' First Set of Interrog-

atories). In view of the rule set forth in *Holiday Homes* and the presumption articulated in the cited case law that an agent must be the effective and procuring cause of a sale to earn a commission, Vanguard's version of the oral contract is legally untenable.[11] The interpretation advocated by Vanguard is in contravention of the majority rule of law regarding broker's commissions. Not only does the existence of an oral agreement between Vanguard and Lightnet rest on uncertain legal footing, but the terms of that agreement are ambiguous and disputed. Because Vanguard is the drafter of the so-called memorialization and proponent of the Vanguard–Lightnet agreement, ambiguities must be resolved against it.

For these reasons, Lightnet is entitled to summary judgment on this issue. In order to be entitled to commissions for sales to companies on its account list, Vanguard must have "caused" those sales.

*Did Vanguard "Cause" the Sale to United and Lease to Americall?*

■ Vanguard argues that even if it is concluded its contract with Lightnet required Vanguard to cause a sale as a condition precedent to receiving a commission, Vanguard is entitled to a fee for its efforts expended on United and Americall. Vanguard maintains that this issue of causation is necessarily fact sensitive and requires a finder of fact to measure the impact of its activities on the sales to United and Americall. Lightnet argues that Vanguard's alleged marketing activities directed at these companies were of no consequence to the deals ultimately consummated by Lightnet. Lightnet provides considerable evidence of its contacts with United and Americall, challenges the validity and weight of the evidence cited by Vanguard

---

**11.** While this court cannot evaluate the practical business implications of Vanguard's alleged commission deal, it is noted that a contract providing for a commission without effort is highly implausible in view of the large amount of money at stake in a purchase of Lightnet capacity. In effect, Vanguard alleges it is entitled to a 2% commission for Lightnet sales made (though not generated by Vanguard) after five months of Vanguard–Lightnet *discussion* (September 1983 to January 1984) and only two

months of active (though not necessarily effective) marketing efforts by Lighnet (October 20 to December 29, 1983). As the Supreme Court noted in *Matsushita,*

> [I]f the factual context renders respondent's claim implausible ... if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary.

475 U.S. at 587, 106 S.Ct. at 1356.

and argues that no reasonable juror could conclude Vanguard was the effective or procuring cause of these business deals.

In an effort to raise an issue of fact with regard to their cause of the United and Americall transactions, Vanguard provides a synopsis of its marketing activities. Vanguard claims that it recognized the importance of United as a potential customer for Lightnet before Lightnet did. After continuously urging Lightnet to authorize Vanguard to pursue the United account, Rice was permitted to contact United. Rice contacted United Vice–Presidents Mont Williams ("Williams") and Bill McDonald ("McDonald") in November and December of 1983. Vanguard attaches a sales report of Rice's activities, dated January 17, 1984 stating:

USTEL [12]

calls: numerous starting 11–15–83 including 11–17–83; 11–28–83; 12–14–83; 12–30–83; 1–5–84; 1–6–84

proposal: 11–14–83

letters: 12–23–83; 12–27–83; 1–5–84

meeting: 12–6–83

status: Waiting for the United Telecom proposed purchase to be approved

Plaintiff's Appendix (Doc. No. 302534).

According to Vanguard, McDonald initially was resistant to a meeting, informing Rice that United was moving rapidly with its own plans to build its own fiber optic network. Rice finally persuaded McDonald that a meeting would make sense, however, and got McDonald to give him a list of available dates for such a meeting. Because of the time pressures involved, Rice decided that the most expetitious way to proceed would be to turn over the coordinating of the meeting to the Lightnet account representative in charge of the United account. Vanguard maintains that Rice was thereafter excluded by Lightnet from further dealings with United.

A few weeks later Evans contacted Rice and informed him that Lightnet wanted to remove United from Vanguard's account list. Rice objected to the removal of United from Vanguard's account list. Wollensack later met with Rice and Van Doren and attempted to explain Lightnet's motivations. Vanguard contends Wollensack pointed out that Vanguard had not expended much effort with regard to United and in view of United's purchase of a ten percent interest in SNET, contacts between Lightnet and United were being made at high levels. Opposition Brief at 35. Rice and Van Doren countered that they had in fact initiated the contact and the underlying policy of the Vanguard–Lightnet agreement was that Vanguard was to receive a commission without regard to "how much" work they had done on a given account. *See* Plaintiff's Appendix at 261–262, Rice Dep. Ex. 87 (Van Doren Memorandum for the Record June 22, 1984).[13]

Vanguard cites to the deposition testimony of Dick Myers ("Myers"), an in-house marketing person for Lightnet, and Joe Paulick ("Paulick"), the Lightnet salesperson with responsibility for the United account. Myers acknowledged that Rice had raised the subject of pursuing United. Myers Dep. at 45. But Myers testified he could not remember more than six occasions when Rice mentioned the United account. *Id.* Paulick testified that Rice "suggested that United was interested in Lightnet. That's all I know." Paulick Dep. at 23. Paulick also acknowledged Rice had been saying for some time that they should "get on the stick with United." *Id.*

Significantly, Vanguard concedes that Lightnet (via CSX, its parent) was engaged in discussions with high level officers at United. *See* Gardiner Dep. at 14–15. Vanguard also does not dispute that SNET (Lightnet's other parent) had expressed in-

---

**12.** United acquired U.S. Telephone (USTEL) in early 1984. USTEL was on the Vanguard prospect list before this acquisition was consummated. Moving Brief at 16.

**13.** According to Vanguard, Wollensack did not deny this was the promise of the account list agreement. Rather, Wollensack offered Rice

and Van Doren $25,000 if they would agree to remove United from the account list. Van Doren Dep. at 820. Vanguard rejected this offer. Rice Dep. at 223–224. Lightnet objects to the admissibility of this "settlement offer." Reply Brief. at 22–23 n. 14.

terest in United before Vanguard ever made contact with Lightnet. *See* Wollensack Aff. ¶ 11 and Ex. E at A(1), A(2), A(4), A(12). Further, Vanguard does not dispute that United independently contacted CSX in December, 1983 in search of a right-of-way for a fiber optic network.

As Vanguard concedes, Lightnet had made contact with United long before Vanguard arrived on the scene. These contacts were far more extensive and significant than Vanguard represents. In 1980, Paul Gardiner ("Gardiner"), a transportation specialist for the Department of Defense, sent to both CSX and United an article he published about the potential use of railroad rights-of-way to construct a fiber optic communications network. Gardiner and United had a series of communications on this subject, during which United expressed interest "in either being a partner with the railroad or buying capacity in any new major trucking network built in the country using rail rights of way." Gardiner Dep. at 18–22, 37–38 and Exs. 3, 4 and 5; *see also* Henson Dep. at 9–10.

Gardiner was retained as a consultant to CSX in 1982. Gardiner then met with United's vice president of business development to explore United's interest in the CSX right-of-way. Gardiner Dep. at 22. As Gardiner reported to CSX in a contemporaneous memorandum of that meeting,

> UT [United] ... feels a railroad based fiber optic trunking network in conjunction with local access lines has much potential, and UT wants to 'be involved' in the planning stages....
>
> UT *would be interested in using circuits on a railroad fiber optic cable system depending on markets served and price; could be interested in committing to long term contracts 12–18 months prior to initiation of service*— sees the need for greatly expanded capacity in many inter-city markets for voice, data and video transmissions.

Gardiner Dep. Ex. 5 (emphasis added). These contacts between CSX and United predated Vanguard's first approach to SNET by more than a year.

CSX was also put in contact with United through the efforts of LaBlanc, *see supra* at 6, and Booz, Allen & Hamilton, a consulting firm retained to analyze the potential market for the fiber optic network planned for Lightnet. A marketing report submitted to SNET by Booz, Allen & Hamilton on May 12, 1983 placed United Telecommunications at the top of the list of prospective customers for fiber optic capacity. Many United subsidiaries were themselves listed as potential customers, including United's telephone operating companies in Florida, Indiana, Pennsylvania and Missouri; Isacomm (a United subsidiary engaged in satellite transmissions); and U.S. Telecom, another United company. Wollensack Aff. at ¶ 11 and Ex. E at A(1), A(2), A(4), A(12).[14]

During the period CSX, SNET and LaBlanc were forming the Lightnet joint venture, United was investigating the development of a fiber optic communications network. Paul Henson ("Henson"), United's chairman, testified he had knowledge of Lightnet's formation as early as April, 1983, six months before Vanguard approached Lightnet. Henson Dep. at 9–11. United organized a task force to explore options for expanding United's business into long distance communications. The task force focused on fiber optic technology as the means of achieving this expansion. In September, 1983, the task force recognized that CSX was one of two eastern railroads with the rights-of-way necessary to support a fiber optic network. On December 7, 1983, the United board of directors approved the task force recommendation to build a national fiber optic network. John Lucas ("Lucas"), general counsel of U.S. Telecomm, the long distance subsidiary of United, assumed responsibility for acquiring the necessary rights of way. Lucas contacted CSX in the winter of 1984.

---

**14.** The Booz, Allen & Hamilton report to SNET noted that "CSX has relationship" with U.S. Telecom and recommended that CSX contact this potential customer. Wollensack Aff. at ¶ 11 and Ex. E at A(12).

Overtures made by Lucas to CSX were directed to Lightnet. A meeting was held in Washington, D.C. between February and April among Lucas, Williams, Wollensack and Mark Aron, general counsel of CSX. Lucas testified that this meeting

A: ... was the first time for us to meet each other and the LIGHTNET individual was arguing that LIGHTNET was the answer to United's problems.

. . . . .

Q. Was United interested in obtaining capacity from LIGHTNET at that point?

A. No, we were not.

Lucas Dep. at 33–34.

Representatives from CSX, SNET, Lightnet and United met on various occasions during the spring and summer of 1984. Written proposals were exchanged between Lightnet and United. At the initial state of negotiations, United was only interested in obtaining rights-of-way, not purchasing fiber optic capacity. However, by the fall of 1984, an agreement in principle was reached under which United would purchase capacity on the Lightnet fiber optic network. After five months of negotiations, the parties reached a final agreement, on March 13, 1985, for the sale of Lightnet capacity to United.

Lightnet maintains that Vanguard's contacts with United were minimal and made no contribution to the sale ultimately transacted by Lightnet. Lightnet points to the deposition testimony of participants in the United–Vanguard exchange to support its argument that Vanguard's contacts with United were inconsequential. Michael Fuller, Senior Vice–President of United and in charge of the Lightnet–United task force, testified that he never heard of Vanguard; that its name did not come up in the task force's deliberations; that to his knowledge, Vanguard had nothing to do with the task force recommendation; that the decision to contact CSX had nothing to do with Vanguard; and that Vanguard had nothing to do with causing United to meet with CSX, SNET and Lightnet, or to negotiate a contract with Lightnet. Fuller Dep. at 26–28, 62.

Lucas, U.S. Telecomm general counsel, who made the initial contact with CSX which led directly to the negotiations and the eventual contract with Lightnet, testified that Vanguard had nothing to do with his decision to contact CSX in late 1983 and early 1984. Lucas testified that he had never even heard of Vanguard until he was informed of the present litigation. No one from Vanguard was involved in any of the meetings he attended. Lucas Dep. at 43–47.

William McDonald, President of Uninet, a subsidiary of United, was put in charge of implementing the recommendation of the Lightnet–United task force in January 1984 and personally negotiated the agreement in principle with Wollensack. McDonald did not even know of Vanguard's existence, had no dealings with it, and knew of no dealings with Vanguard by anyone on his staff. Vanguard did not participate in any meetings with McDonald. McDonald Dep. at 29–30.

Mont Williams, Assistant Vice–President of business development for United, was one of the principal negotiators of United's contract with Lightnet. Williams confirmed that Vanguard neither set up any meetings nor was present at any of them. According to Williams, throughout the months of negotiations with Lightnet, no one from Vanguard participated in any way. Williams disputes Rice's testimony and records of sales report activities with United. Rice testified he telephoned Williams with a proposal to sell Lightnet capacity to United on January 10, 1984. But Williams had no specific recollection of that call. According to Williams, if the call was indeed made, it had no impact on Williams' dealings with Lightnet. As Williams testified:

Q. Was the decision to contact CSX in any way caused by the telephone call from James Rice?

A. It was not.

Williams Dep. at 19.

The testimony of United Chairman Henson also supports Lightnet's argument that Vanguard was not involved with United's

decision to purchase fiber optic capacity from Lightnet:

A. No, ... there's no way. We ... approached this on our own.... We had researched the field thoroughly and we made our own independent business decisions.

Henson Dep. at 17.

██ In its opposition papers, Vanguard claims it was also the effective cause of Americall's lease of Lightnet fiber optic capacity.[15] Vanguard presents evidence that Rice contacted Americall officials during November of 1983. A proposal was sent on November 28, 1983 and follow-up call on December 16, 1983. Plaintiff's Appendix (Bates Doc. No. 302530). Lightnet also disputes Vanguard's contentions with regard to Americall. Lightnet maintains that as with United, CSX had substantial contacts with Americall executives prior to Vanguard's participation with Lightnet. Americall Executives knew the executives of CSX personally and had transacted business with them previously. Americall's headquarters were located next door to the CSX offices in Jacksonville, Florida.

Barry Vaughn ("Vaughn"), the president of Americall, personally contacted an official at CSX to inquire whether CSX would be interested in purchasing telecommunications services from Americall. This contact was made in the Spring of 1983, at least five months before Vanguard initiated its contact with Lightnet. Vaughn proposed that Americall purchase capacity from Lightnet for its network and/or also market Lightnet capacity in Florida. Vaughn's calendar entries confirm a meeting with CSX on May 6 during which these matters were discussed. Vaughn Dep. Ex. 1.

On May 25, 1983, Vaughn met with James Barry ("Barry") of SNET, the individual responsible for marketing the new CSX/SNET venture. Vaughn and Barry discussed Americall's desire to purchase and/or market Lightnet capacity. Vaughn met with Wollensack and other Lightnet personnel throughout the fall of 1984. On November 21, 1984, a letter of intent was entered between Americall and Lightnet for the lease capacity of the Lightnet system with an option to purchase. Vaughn Dep. Ex. 3.

Vaughn, who personally negotiated the lease with Lightnet, testified that Vanguard played no part in that transaction. Vaughn Dep. at 23 and Ex. 3. Vaughn acknowledges receiving Rice's call, followed by a form letter, dated November 28, 1983, and testified he informed Rice that Americall was already engaged in discussions with SNET regarding the acquisition of network capacity and was not in need of Vanguard's assistance. Vaughn Dep. at 29–34. Vaughn testified,

Q. What would be your response, Mr. Vaughn, to the suggestion that Vanguard or Mr. Rice had any influence on your decision, Americall's decision, to lease capacity from Lightnet?
A. That is a ridiculous notion. I did not need Vanguard's assistance. They didn't tell me anything that I didn't know nor did I request any assistance or help or agree to work with them in any way.

Vaughn Dep. at 36.

Vanguard attempts to mitigate the damage of Vaughn's testimony by characterizing the Lightnet–Americall early contacts as proposals to "market" not "purchase" Lightnet capacity. Opposition Brief at 66. Vanguard also points out that Vaughn's diary reflects a number of meetings with CSX and SNET in April and May of 1983, but nothing from June through November of 1983. Plaintiff's Appendix at 273 (Vaughn Dep. Ex. I). Then, on December 1, 1983, Vaughn notes an important telephone call with Lightnet—just days after Rice sent Vanguard's proposal to Vaughn.

Lightnet maintains Vanguard has provided no evidence to contradict the testimony of witnesses who participated in the United and Americall transactions. Vanguard merely attacks the credibility of these witnesses and argues a jury should have the

---

**15.** It is noted that there are no allegations with regard to the Americall account set forth in the Complaint.

opportunity to assess the facts as presented by both parties.

Summary judgment is ordinarily inappropriate where an individual's intent, state of mind and credibility are implicated. *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *Patrick v. Lefevre,* 745 F.2d 153, 159 (2d Cir.1984); 10A West's Federal Practice § 2726. However, the mere incantation of credibility cannot defeat an otherwise valid motion. *Meiri,* 759 F.2d at 998. If such a nominal challenge alone were sufficient to raise a question of fact the purpose of the summary judgment rule would be defeated. *See Celotex,* 477 U.S. at 323–34, 106 S.Ct. at 2553 ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it would be interpreted in a way that allows it to accomplish this purpose.")

Once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing a need for trial. *See* Fed. R.Civ.P. 56(e); *Alizadeh v. Safeway Stores,* 802 F.2d 111, 113 (5th Cir.1986) (party opposing a motion for summary judgment must counter a properly supported motion with specific factual disputes; mere general allegations are insufficient). In determining whether summary judgment is appropriate, a trial court must be cautious not to overstep its circumscribed sphere of authority. The court may neither weigh competing inferences nor resolve factual disputes. *Chipollini,* 814 F.2d at 900. However, before a court can conclude a genuine issue of fact exists, it must assess whether the evidence presented by the party opposing summary judgment has actually contradicted the movant's evidence. *First Natl. Bank of Pa. v. Lincoln Nat. Life Ins.,* 824 F.2d 277, 280 (3d Cir.1987).

In this case, the evidence provided by Lightnet establishes its claim that Vanguard did not "cause" the sale to United and the lease to Americall. Vanguard has failed to rebut this with any facts which suggest its marketing activities were a significant contributory factor to these transactions.

Vanguard argues that its burden of raising a question of fact with regard to causation is much lighter than Lightnet implies and suggests Lightnet's test for broker-causation is overly stringent. According to Vanguard, a broker does not have to convince the buyer to buy, or even participate in the sales negotiations. A broker's role is to bring the parties together, and so long as that leads—without a substantial break—to a sale, the broker satisfies the cause requirement. Vanguard points to the *Restatement (Second) of Agency* as support for a more limited criteria of a broker's role:

> [T]he broker is ordinarily entitled to his commission, under the rules stated in this Section, if he causes a customer to negotiate with the principal and the customer makes a purchase without substantial break in the ensuing negotiations. *It is not necessary that the broker conduct the negotiations or even be a influential factor in persuading the customer to accept the terms; nor is it necessary that the broker should personally introduce the customer or bring the princpal to his attention;* he introduces the customer if, through any means which he uses to attract attention, the purchaser is lead to the principal.

Comment d to § 448 (emphasis added).

However, Vanguard has not come forward with evidence that its efforts brought United and Americall to Lightnet. A broker is entitled to a commission when it acts as "the vital spark which ignite(s) [the buyer's] dormant interests into a blaze of activity to make the purchase." *Arthur H. Richland Company v. Morse,* 169 F.Supp. 544, 551 (D.Md.), *aff'd,* 272 F.2d 183 (4th Cir.1959). Vanguard has offered no evidence of this spark. A party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Carney v. Dexter Shoe Co.,* 701 F.Supp. 1093, 1097 (D.N.J.1988) (quoting *Matsushita*

*Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

Lightnet has come forward with substantial and credible evidence that the business transacted with United and Americall was the result of Lightnet's—and not Vanguard's—efforts. Vanguard has failed to undermine this proof or present contradictory evidence which raises a genuine issue of material fact requiring the judgment of a jury. Accordingly, Lightnet's motion for summary judgment is granted.

*Fraud Claim*

 On March 31, 1989, Vanguard filed a motion for leave to file a second amendment to its complaint to add a count sounding in fraud. Vanguard asserts in its Notice of Motion it became aware of an evidentiary basis for this claim in August, 1988. Vanguard Notice of Motion ¶ 5. Although the reason for an eight month delay in filing this motion is not explained, the delay is not the reason Vanguard's motion is denied. "The court may ... refuse to allow an amendment that fails to state a cause of action." *Adams v. Gould, Inc.*, 739 F.2d 858, 869 (3d Cir.1984), *cert. denied*, 469 U.S. 1122, 105 S.Ct. 806, 83 L.Ed.2d 799 (1985).

Vanguard alleges the basis of its fraud count is that "Lightnet entered into an agreement with Vanguard without intending to honor that agreement." Opposition Brief at 78. Accordingly, this is not a claim of fraud in the inducement or a claim otherwise extraneous to the terms of the asserted contract.

In *Spring Motors Distributors, Inc. v. Ford Motor Co.*, 98 N.J. 555, 489 A.2d 660 (1985), it was held a truck dealer who could sue a manufacturer pursuant to a contract could not also sue in tort for negligence and strict liability for economic losses. The court stated: "As among commercial parties ..., contract law ... provides the more appropriate system for adjudicating disputes arising from frustrated economic expectations." 98 N.J. at 568, 489 A.2d 660.

*Spring Motors* does not address fraud claims. However, two courts in this district, applying the rationale of *Spring Mo-*tors, have dismissed fraud claims when they arise in the context of a commercial contract dispute. *Werner v. Pfleiderer Corp. v. Gary Chemical Corp.*, 697 F.Supp. 808, 814–815 (D.N.J.1988); *Unifoil Corp. v. Cheque Printers and Encoders, Ltd.*, 622 F.Supp. 268, 270 (D.N.J.1985).

> *Spring Motors* ... articulated [a] policy of restricting the remedies available to commercial entities involved in a dispute which is essentially contractual in nature, and the disputed performance is covered by the contract.

*Werner*, 697 F.Supp. at 815. The exception to this rule recognized by *Werner* and *Unifoil* applies only when the fraud alleged is extrinsic to the terms of the contract.

Here Vanguard argues its fraud claim is based on the allegation that Lightnet did not intend to perform the contract at issue. Vanguard states its fraud claim is based upon "the same set of facts as the other three counts already alleged in the complaint" (Vanguard Notice of Motion ¶ 2) and "the evidence needed to defend this claim would be identical to that required for the other counts." *Id.* at ¶ 3. Based on these representations, the fraud alleged by Vanguard does not appear to be extrinsic to its underlying contract claim. Because Vanguard's proposed amendment does not state a cause of action, denial of leave to amend is appropriate. *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 613 (3d Cir.1987).

Even if the proposed Vanguard amendment were permitted, summary judgment would be appropriate on the claim. Vanguard has indicated that no further discovery is needed. Vanguard Notice of Motion at ¶ 3. Because allegations of fraud must be proved by clear and convincing evidence, *Schmidt v. Schmidt*, 220 N.J.Super. 46, 531 A.2d 385 (1987), the "inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying the evidentiary standard could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2515. Viewing the record in a light most favorable to Vanguard, the evidence of fraud presented by Vanguard is deficient

and does not approach the clear and convincing level necessary to support a reasonable jury's finding of fraud.

■ In support of the fraud contention, Vanguard offers a statement taken from the deposition of Wollensack and a March 5, 1984 memo from Evans to Wollensack. Wollensack testified he had spoken with Evans during December, 1983 about the Lightnet plan to bring its marketing efforts in-house. Vanguard makes reference to and cites the Wollensack testimony as follows:

> Frank Wollensack practically admitted this scheme in his deposition. He testified that during a December, 1983 meeting with Dennis Evans about bringing the Lightnet marketing effort in-house, he stated the following with respect to Vanguard:
>
> > In particular, I cautioned him [Evans] that we didn't want to disturb any of the relationships that existed at the moment with Jim Rice being present at Allnet and, according to his reports, being on the verge of making a sale of LightNet facilities to Allnet. So, I cautioned him, no, if you are going to bring everything in-house and not use others, just do it in a careful way. And in particular, if you are discounting any kind of cooperation with Vanguard—
> >
> > Q. Don't jeopardize the Allnet deal?
> >
> > A. Don't jeopardize the Allnet deal.

Opposition Brief at 81 (citing Wollensack Dep. I at 35).

Lightnet points out that Vanguard omitted the first sentence of Wollensack's statement which explains: "It had to do with the fact that [Evans], who was relatively new on the job, was expressing dissatisfaction with whatever Vanguard purported to be able to do in the marketplace." Wollensack Dep. I at 31–32. Lightnet argues that "Wollensack cautioned Evans, however, that 'if you are discounting any kind of cooperation with Vanguard ... don't jeopardize the Allnet deal.'" Reply Brief at 49 (citing Wollensack Dep. I at 32).

It appears to be unreasonable to suggest this statement forms the basis for a fraud claim. At the time this statement was made, both Lightnet and Vanguard were negotiating a possible contract. Vanguard had produced no sales but at the time was attempting to sell Lightnet capacity to Allnet. The Wollensack statement upon which Vanguard bases its claim of fraud cautions and directs Evans against discontinuing relations with Vanguard. There is no evidence to support the Vanguard allegation and the Vanguard view of the Wollensack testimony that "Lightnet had secretly decided to 'discontinue any kind of cooperation' with Vanguard." Opposition Brief at 81.

It appears that on December 22, 1983 Evans told Vanguard through Rice and Van Doren that "Vanguard should hold off contacts with customers on its account list except ... where ... preliminary proposals have been mailed." Opposition Brief at 23–24. This was confirmed by letter from Rice to Evans. Rice Dep. Ex. 46.

Vanguard has also acknowledged that on January 13, 1984 Evans "told Van Doren that Lightnet would exercise complete control over the accounts; that Vanguard would be able to have contact with customers only when and if specifically directed by LIGHTNET—that Vanguard would not be free to act on its own initiative." Opposition Brief at 26; *see also* Van Doren Dep. at 410, 412. The Wollensack testimony reflected the position of Lightnet which Vanguard concedes it understood.

■ The other piece of evidence cited by Vanguard in support of its fraud claim is the March 5, 1984 Evans document to Wollensack which Vanguard quotes as stating:

> It is quite clear when we get down to the detail, Frank, that we've made the right decision to disengage from Vanguard.

Opposition Brief at 82.

This quotation is taken out of context. In pertinent part, the March 5, 1984 document states:

> My January 27th letter [to Vanguard] summarizes the role I see for Vanguard with the accounts on their list and we've

already moved ahead. Dick Meyers spent the day with Jim Rice and has carefully reviewed each customer. Where appropriate, a joint contract (Meyers and Rice) will be made. In instances where Mr. Rice was not close to the customer, we will take over.

It is quite clear when we get down to the detail, Frank, that we've made the right decision to disengage from Vanguard. Although they are uniquely positioned with ALLNET, that's about where it ends. Virtually, everything else was cold canvas, starting with an introductory phone call. They are not positioned in industry—as they claim to be.

Evans Dep. Ex. 18.

This document does not support a claim for fraud. It appears to evidence a decision by Lightnet to continue a relationship to the extent described in the memo and as indicated in the Evans January 27 letter to Van Doren.

Succinctly stated, there is no basis for a claim of fraud with regard to the facts in this matter.

*Conclusion*

Because Lightnet's motion for summary judgment is granted with regard to the terms of the Vanguard–Lightnet contract and the issue of causation, Vanguard's complaint is dismissed and the issue of punitive damages is moot. Vanguard's motion to amend its complaint to allege fraud is denied. This matter is dismissed with costs.

SO ORDERED.